Rosa A. **Jasper** and Lourdes T. Manglona,
Plaintiffs/Appellees,
**v.**
Antonio O. **Quitugua** and
The Office of the Governor,
Defendants/Appellants.
Appeal No. 97-009
Civil Action No. 95-1174(R)
February 8, 1999

Argued and Submitted September 29, 1998

Counsel for appellant Antonio O. Quitugua:  F. Randall Cunliffe (Cunliffe & Cook), Agana, Guam, and Brien Sers Nicholas, Saipan.

Counsel for appellees:  John M. Chambers, Saipan.

BEFORE: LIZAMA, Justice Pro Tem, TAYLOR, Justice Pro Tem, and SALAS, Special Judge.

TAYLOR, Justice Pro Tem:

¶1 ▌ Appellant/defendant, Antonio O. Quitugua ("Quitugua"), appeals from a jury verdict awarding appellees/plaintiffs, Rosa A. Jasper and Lourdes T. Manglona, $225,000 in damages for assault, battery, and intentional infliction of emotional distress. We have jurisdiction pursuant to 1 CMC § 3102, and article IV, § 3 of the Commonwealth Constitution. N.M.I. Const. art. IV, § 3 (1997). We reverse and remand for further proceedings consistent with this opinion.

### ISSUES PRESENTED AND STANDARDS OF REVIEW

The appellant raises four issues for our review:

I. Whether the trial court's jury instructions regarding the statements of Quitugua were erroneous as a matter of law.
II. Whether the trial court's instructions regarding punitive damages were inadequate as a matter of law.
III. Whether the trial court's refusal to permit the pro se Chamorro Defendant Quitugua to question the witnesses in Chamorro, violated the Commonwealth Constitution and Quitugua's right to due process and equal protection of the laws.
IV. Whether the withdrawal of the Attorney General's Office ("AGO") as counsel for Quitugua and subsequent failure to obtain other counsel for him, and the AGO's subsequent representation of the Office of the Governor with a theory antagonistic to Quitugua violated his right to due process of law and a fair trial in this action.

¶2 ▌ Issues I and II involve questions of law and are reviewed de novo. *Rosario v. Quan*, 3 N.M.I. 269, 276 (1992). Issues III and IV involve constitutional questions and are reviewed de novo. *Office of the Attorney General v. Rivera*, 3 N.M.I. 436, 441 (1993).

### FACTS AND PROCEDURAL BACKGROUND

¶3 Rosa A. Jasper and Lourdes T. Manglona ("appellees"), filed suit against Quitugua for assault, battery, and intentional infliction of emotional distress arising out of a December 5, 1995, incident that occurred at the Office of the Governor on Rota.[1] The appellees also brought suit against the Governor's Office for breach of contract. Initially, the AGO filed answers to the original complaint on behalf of Quitugua and the Governor's Office on January 10, 1996. The matter then proceeded to discovery, and after eight months, the AGO moved to withdraw from representing Quitugua on September 26, 1996, after the AGO determined that it would no longer be able to represent both parties for conflict of interest reasons. The matter was brought forth in a bifurcated trial on Rota on March 3, 1997, wherein Quitugua appeared pro se. On March 5, 1997, the jury returned a verdict against Quitugua for a total of $225,000 in damages.[2] Quitugua timely appealed.

### ANALYSIS

*I. The Jury Instructions*

¶4 Quitugua appeared pro se after the AGO withdrew its representation of him. At trial, preceding his testimony, the trial court made the following statement:

> Well alright, members of the jury, this is a bit unusual. What's going to happen is since Mr. Quitugua is not represented, he'll probably just testify in the narrative. It means he'll just give us a statement and after that, both parties are entitled to cross examine him and ask him questions, alright? All right, go ahead Mr. Quitugua.

(R. at 429, ln. 13-18). Quitugua then took the witness stand and narrated a statement to the jury. Following his testimony, he was cross-examined by opposing counsel and then the court. When the trial court instructed the jury, it gave the following instruction: "The arguments and statements made by the lawyers and Mr. Quitugua are not

---

[1] At all times pertinent to this case, Quitugua was a Special Assistant for Administration employed by the Governor's Office and was stationed at the Office of the Governor's Representative on Rota. He was sued both individually and in his official capacity for wrongfully terminating the plaintiffs' employment contract. Excerpts of Record ("E.R.") at 2.

[2] *Jasper v. Quitugua*, Civil Action No. 95-1174R (N.M.I. Super. Ct. March 12, 1997) (Jury Verdict and Decision at 1-2) ("Order"). At the conclusion of the bench trial for the plaintiffs' breach of contract claim, the trial court found that the Office of the Governor did not breach its employment contract with the plaintiffs, but ordered that the plaintiffs receive compensation for certain Commonwealth holidays for the duration of their employment contract, as conceded by the defense, the Office of the Governor. Order at 4.

221

evidence." (R. at.489, ln. 4-5.) Quitugua now argues that such a jury instruction constitutes plain error and was clearly erroneous, and, therefore, merits reversal by this Court. We disagree.

¶5　The trial court correctly distinguished between those statements Quitugua made on the witness stand which were admissible evidence, and those statements made during opening and closing statements which were clearly inadmissible evidence. After Quitugua received the oath, the court instructed the jury by stating "members of the jury, this is a bit unusual. What's going to happen is since Mr. Quitugua is not represented, he'll probably just *testify* in the narrative." (R. at 429, ln. 14-15) (emphasis added).

¶6　██At the conclusion of the trial, the court instructed the jury with two separate jury instructions. The first pertained to evidence which the jury could consider during its deliberations:

> Now, a good question might be what is evidence? The evidence from which you decide what the facts are consist of, No. 1, *the sworn testimony of the witnesses that you heard on the stand*, both the direct examination and the cross examination, regardless of who called the witness.

(R. at 488, ln. 14-18) (emphasis added). The court then proceeded with its second instruction pertaining to those items which were not in evidence. The court stated, "[t]he arguments and statements by the lawyers and Mr. Quitugua are not evidence," and clarified in the next sentence that the arguments and statements to which he was referring were the opening and closing arguments. "What they have said in their opening and closing statements and in their closing arguments and at other times is intended to help you interpret evidence, but it is not evidence." (R. at 489, ln. 4-8).

¶7　These two instructions were both necessary and proper in order for the jury to grasp the distinction between admissible evidence and inadmissible testimony during opening and closing statements. Quitugua interprets the first instruction in an extremely narrow fashion. Upon further review of the entire record, however, especially the judge's second sentence, we hold that the jury instructions given were proper.

*II.　The Jury Instructions Regarding Punitive Damages*

¶8　██Quitugua takes exception to the jury instruction regarding punitive damages. Quitugua argues that the RESTATEMENTS OF TORTS pertaining to punitive damages should have been read to the jury instead of California BAJI Instruction 14.71, because of the applicability of the common law to the Commonwealth, codified at 7 CMC § 3401. The RESTATEMENT pertaining to punitive damages

reads as follows:

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

RESTATEMENT (SECOND) OF TORTS § 908(1), (2) (1979). Quitugua contends that the California instruction uses terminology and language which is not found in the RESTATEMENT definition.[3] Here, we emphasize that the

---

[3] California BAJI Instruction 14.71 is substantially longer than the Restatements because it defines the terms in the Restatement, and was read to the jury as follows:

> Punitive Damages. There is also a claim for punitive damages. If you find that plaintiffs suffered damage as a proximate result of the conduct of defendant upon which you base a finding of liability, you may then consider whether you should award punitive damages against defendant for the sake of example and by way of punishment. You may, in your discretion, award such damages if, and only if, you find by a preponderance of the evidence that said defendant is guilty of oppression or malice in the conduct upon which you base your finding of liability.

> Malice means conduct which is intended by the defendant to cause injury to the plaintiff or carrying on by the defendant with a conscious disregard of the rights or safety of others. A person acts with a conscious disregard of the rights or safety of others when he or she is aware of the probable dangerous consequences of his conduct and wilfully fails to avoid these consequences.

> Oppression means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

> The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion to exercise without passion or prejudice.

> In arriving at any award of punitive damages, you are to consider the following: the reprehensibility of the conduct

222

RESTATEMENT definition does not articulate a burden of proof. Thus, the California BAJI's Instruction's burden of proof – by a preponderance of the evidence – does not run inconsistent with the common law rule found embodied in the RESTATEMENTS. In addition, we find that the differences between the proposed jury instructions regarding punitive damages based upon the RESTATEMENTS and the instructions given based upon the California statute were negligible. Quitugua's rights, therefore, were not affected by the instruction as given.

¶9 ■ Even further, we agree with the appellees who assert that Quitugua failed to preserve for appeal the question of whether the trial court erred in its jury instructions as Quitugua neither offered any jury instructions of his own, nor objected to the proposed instructions at the beginning of or during the trial. According to Com. R. Civ. P. 51, "[N]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Absent such objection, Quitugua lost his chance to appeal this issue.

*III. The trial court's refusal to permit Quitugua to question the witnesses in Chamorro.*

¶10 The N.M.I. Constitution provides that Chamorro, Carolinian and English shall be the official languages of the Commonwealth. Quitugua was permitted to do his opening and closing arguments in Chamorro, but the court denied his request to question the witnesses in Chamorro stating that his request "posed too many translational problems." (R. at 171, ln. 24-25). The court then went on to express its feelings as to appellant's ability to speak English – Quitugua spoke very good English – and the court felt it would put the court at a disadvantage and take longer. (R. at 172, ln. 3-8). Quitugua argues that the court's failure to allow Quitugua to proceed in questioning the witnesses in his native tongue, Chamorro, disadvantaged him and violated his rights to due process and equal protection, as guaranteed by the N.M.I. Constitution. We agree.

¶11 ■ While we recognize that the decision on whether to appoint an interpreter vests within the discretion of the trial court, *State v. Mendez,* 784 P.2d 168, 170

(Wash.App. 1989) (trial court does not have affirmative duty to appoint interpreter for defendant where defendant's lack of fluency or faculty in language is not apparent), because there are three official languages in the Commonwealth, Quitugua should have been given the opportunity to question the witnesses in Chamorro. Had Quitugua been represented by counsel, this Court would have recognized the obligation to inform the lower court prior to trial that he preferred to speak Chamorro so that arrangements for an interpreter to assist the court in the proceedings could have been made. He was not, and therefore, his request to speak Chamorro, even at the day of trial, should have been recognized and it was error not to allow him to proceed in Chamorro.

*IV. The AGO's Withdrawal as Counsel for Quitugua.*

¶12 ■ Quitugua argues that the AGO's representation of the Governor's Office was directly hostile to his defense, and as a former client, Quitugua should have been afforded adequate safeguards under the Model Rules of Professional Conduct.[4] In addition, Quitugua claims he was prejudiced by the AGO's withdrawal, by the AGO's defense which was directly antagonistic to him, and by the AGO's use of privileged, confidential information against him. We agree.

¶13 Initially, the AGO agreed to represent Quitugua pursuant to 7 CMC § 2301 et seq., which provides for the legal defense of public employees and the public entity's right of indemnification. *See* 7 CMC § 2304. The AGO filed an answer on January 10, 1996, *on behalf of Quitugua.* On February 21, 1996, the AGO, *on behalf of Quitugua,* filed an Ex Parte Motion for an Extension of Time to Answer Discovery; on July 18, 1996, the AGO filed the appellants' (both Quitugua and the Office of the Governor) Responses to Plaintiff's Second Set of Interrogatories. It took the AGO approximately eight months to withdraw from representing Quitugua, after it discovered a conflict of interest.

¶14 While the initial representation of Quitugua and the subsequent withdrawal by the AGO alone is not enough to find reversible error, we find persuasive the fact that the AGO continued to represent the Office of the Governor instead of withdrawing itself from representation of both clients and seeking alternate counsel. We recognize that according to the Model Rules of Professional Conduct, the AGO needed the prior *consent* of Quitugua, a formerly represented client, before representing the Office of the

of the defendant; the amount of punitive damages which will have a deterrent effect on the defendant in light of the defendant's financial condition. Punitive damages must bear a reasonable relation to actual damages.

If you find that plaintiff is entitled to an award of punitive damages against defendant, you shall state the amount of punitive damages separately in your verdict form.

---

[4] The Court is concerned with potential violations of Rule 1.7(b) and Rule 1.9 of the ABA Model Rules of Professional Conduct by the AGO, and therefore, transmits a copy of this opinion to the Northern Marianas Bar Association Disciplinary Committee for further investigation.

Governor. Rule 1.9(a) provides as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless *the former client consents after consultation.*[5]

No such prior consent was obtained. Therefore, we hold that the AGO's representation of the Office of the Governor directly adverse to Quitugua, a former client, was error.

¶15 Further, the trial testimony elicited by the AGO uses privileged, confidential information directly adverse to Quitugua's position. The trial strategy of the Office of the Governor was that it had not breached the contract with the plaintiffs in this case, because there was never a termination. (R. at 130, ln. 10-11, ln. 16-17, ln. 19-20). It was the position of Quitugua in his statements to the court and to the jury that the accusations that he pushed or poked the plaintiffs were false and unfounded.

¶16 At trial, on behalf of the Office of the Governor, the Assistant Attorney General asked Vivian Hocog:

> Q: And you've never come to work before and see [sic] Mr. Quitugua or anybody else poke anybody in the chest or push them backward, you've never seen that, have you?
> A: No.
> Q: And you've never seen anybody take chairs away from people and cause them to jerk against tables or anything like that, have you?
> A: No.
> Q: Any you've never -- okay, this whole thing was just very different than anything that had ever happened before in the Office of the Governor, isn't that right?

(R. at 162, ln. 15-25).

> * * *
> Q: I think you mentioned in your testimony something to the effect of Mr. Quitugua said that he needed some of the chairs ah, because there was a meeting -- that there was going to be a meeting and he needed the chairs, do you recall that?
> A: Yes.
> Q: Was there actually a meeting?

> A: No.
> Q: So, Mr. Quitugua was *lying* when he told the plaintiffs that he needed those chairs for a meeting, is that right?
> A: There was no meeting that day. I would have known it. Ah whenever they use the conference room, they let me know.

(R. at 164, ln. 19-25, & R. at 165, ln. 1-6) (emphasis added). Eventually, the Attorney General elicited testimony from Vivian Hocog that she thought Quitugua was a *liar*. "Isn't it true that you think that Mr. Quitugua is a *liar*? . . . And, how long did you know him before you came to the personal feeling, just at least for you that Mr. Quitugua was a *liar*?" (R. at 334, ln. 3-4, 17-19) (emphasis added).

¶17 During closing argument, presented in the Rota Courthouse while the jurors were deliberating the fate of Quitugua in the adjacent room, the same attorney who had represented Quitugua previously for over eight months, summed up his case as follows:

> [MR. COTTON:] Even if there was a meeting and it was canceled, she told them there wasn't one and so they knew that Victor was *lying* after Victor Hocog . . .
> THE COURT: Ah, do you mean Victor was *lying* or?
> MR. COTTON: I'm sorry, knew that Antonio was *lying*.

(R. at 511, ln. 1-6) (emphasis added).

> * * *
> [MR. COTTON:] Rosa testified that next day, Vivian told her that Quitugua had lied about the meeting. She knew Quitugua was *lying*.

(R. at 514, ln. 5-7) (emphasis added). In short, the Attorney General repeatedly called his former client a *liar* while the jurors were deliberating Quitugua's fate in the adjacent juror deliberation room.

¶18 ■ While the trial judge properly explained to the jury that this was a bifurcated trial, that the judge would be trying only those issues pertaining to the Office of the Governor, and that the jury would be trying only those issues pertaining to Quitugua, the issues were too interrelated to be tried together. Some issues were proper for the judge's ears only, while others were exclusively before the jury to consider. Therefore, we hold that it was error to conduct this case as a bifurcated trial. The plaintiffs' cases against each defendant should be tried separately.

---

[5] MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.9(a) (1998) (emphasis added). The Model Rules are made applicable to the Commonwealth according to Com. Disc. R. 2 (1999).

**CONCLUSION**

¶19 Based upon the foregoing reasons, we hereby **REVERSE** this decision and **REMAND** this matter for further proceedings consistent with this opinion. Because we find that the AGO used privileged, confidential information of a former client, the AGO is hereby **DISQUALIFIED** from further representing either party.