**Frank ZAVARO, Plaintiff–Appellee,**

**v.**

**Thomas A. COUGHLIN, III, Defendant,**

**C.R. Homrighouse, Defendant–Appellant.**

**No. 1597, Docket 92–2130.**

United States Court of Appeals, Second Circuit.

Argued June 4, 1992.

Decided July 31, 1992.

Martin Hotvet, Albany, N.Y. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., of counsel), for defendant-appellant.

John M. Regan, Jr., Rochester, N.Y. (Reyes & Regan, P.C., of counsel), for plaintiff-appellee.

Before: OAKES, Chief Judge,* McLAUGHLIN and LAY,** Circuit Judges.

OAKES, Chief Judge:

C.R. Homrighouse appeals from a judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge,* granting plaintiff summary judgment on his claim, asserted pursuant to 42 U.S.C. § 1983 (1988), that Homrighouse violated his due process rights in a prison disciplinary hearing. For the reasons set forth below, we affirm.

## FACTS

On July 31, 1988, a riot erupted in the mess hall of Great Meadows Prison. A number of inmates assaulted officers with fists and makeshift weapons. Plaintiff Frank Zavaro was present in the mess hall at the time. Later that day, an Inmate Misbehavior Report was written up charging Zavaro with violating a prison regulation—Rule 104.10 (codified as amended at N.Y.C.R.R. tit. 7, § 270.2(B)(5)(i) (1989))— prohibiting "violent conduct or conduct involving the threat of violence which creates an immediate danger to life, health, or facility security." The misbehavior report stated:

On 7/31/88, at approximately 3:42 p.m., a riot situation erupted in the North Messhall. This incident included numerous assaults on staff by participants. The assaults included use of weapons, throwing of objects (trays, water pitchers, dishes, etc.) and striking with fists. Subject inmate was identified as being in the messhall during this riot. Employees on the scene verified that all inmates in the messhall were actively participating in this riot. This situation necessitated the discharge of chemical agents to regain control. Upon discharge, several inmates did flee the area. Those remaining were placed in a prone position on the floor. Identification of subject inmate was by departmental I.D. card and during the chemical agent decontamination process.

At Zavaro's disciplinary hearing, Homrighouse, a captain in the New York State Correctional Services, presided as the hearing officer. Because this appeal turns on whether there was "some evidence" supporting Homrighouse's decision, *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985), we examine closely the record of the disciplinary proceeding to see "whether there is any evidence in the record that could support the conclusion reached by" Homrighouse. *Id.* at 455–56, 105 S.Ct. at 2774.

At the hearing, after Zavaro pleaded not guilty to the charge, Homrighouse read several statements into the record. First, he read the following statement by Lieutenant W.E. Philips:

At approximately 3:42 p.m. a disturbance broke out in the north messhall. Information received through subsequent interviews indicates that this was a well planned attack against staff. The plan was for the 3rd group in to trigger the disturbance. Information was also received that during the afternoon inmates were actively seeking participants to go into the messhall and take part in the disturbance. The first group of inmates in the messhall numbered 50 in total, the second group only numbered 30. This is not normal, as it is usual for the first four or five groups to all have 50 inmates. Only getting 30 in the second group indicates the recruiters had problems getting participants. The third group ... was the trigger group and did number 50. Due to the information we have since received and the oddity to the

---

\* After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge.

\*\* The Honorable Donald P. Lay, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

number of the groups, all inmates entering the messhall for the evening meal were aware that assaults on staff were going to take place, and that a disturbance was going to occur. My personal observation on the scene was a well planned attack on staff. I personally observed all inmates, all inmates in the messhall participating in this disturbance by throwing objects such as pitchers, trays, utensils, etc., yelling, screaming, and rushing towards officers in the messhall. Once the third group had entered, an inmate threw his tray down on the table he was at and started walking across the messhall towards the west wall. The entire messhall became immediately quiet and several inmates stood up. The first inmate then rushed an officer then began striking him. Simultaneous to this assault, all inmates in the messhall got up and participated.

Homrighouse then read into the record another statement, this one by Sergeant Kevin H. Smith, the officer who filed the charge against Zavaro:

[A]t approximately 3:40 p.m. ..., 140 inmates had entered the messhall for the meal, and approximately 100 inmates were present in the messhall. As I concluded a phone call ..., I saw Inmate Hawkins, Leonard, 80–A, 82–A–3958 slam his feedup tray down with a loud bang scattering his food and plates. Hawkins then threw his hands up in the air, then jumped up from his seat. I began to walk from the messhall foyer toward the interior of the messhall as I thought Hawkins was about to engage in a fight with another inmate. Inmate Hawkins then began to walk towards the messhall exit door. At this point as myself and Officer Severance began to walk towards Hawkins, I saw another inmate stand up at the table Hawkins left and face Officer Hatch. The messhall became very quiet. Suddenly the inmate Hawkins veered to his left and ran at Officer Severance, striking Severance high on the chest with both hands, lifting Severance off his feet and slamming him against the wall. Hawkins then began to repeatedly strike Officer Severance with

clenched fists. At the same time the unidentified inmate began to assault Officer Hatch. All the inmates in the messhall then stood up, began throwing trays, dishes, and/or physically assaulting the officers in the messhall. As I moved to aid CO Severance, CO Trainee Granger was assaulted and fell to the floor. I was then punched in the left eye and side of my head by an unknown inmate. I notified cellhall and all radio units, "The messhall is going down. Officers are being assaulted." I surveyed the scene in the messhall and saw that all officers in the messhall were being attacked, and all inmates present were standing and throwing trays, plates, etc. I then made a call, "All units, we have lost the messhall. We are going to use gas. Gas booth, drop the gas, drop the gas." Gas was then deployed in the messhall and the inmates stopped the attack and began to run out of the messhall.... I then began to check the officers for injuries, proceeded to secure the remaining inmates in the messhall....

Three short statements were read, each repeating in virtually identical language that "every inmate in the messhall" participated in the riot.

Homrighouse then turned his attention to Zavaro: "[L]et's hear what you have to say about what happened. Were you in the messhall?" Zavaro responded:

Yes I was. I don't know exactly what time I went in there but I did go in there to eat. I sat down in the fourth table when you walk in to your right, to eat at the diet table. I did not even get my food. Now, I'm sitting there and all of a sudden a whole bunch of trays started flying, a whole bunch of shit jumped off, and the gas was dropped. I did not at any time get out of that chair until I was ordered to lay on the floor. At any time. And the only reason they had my name is because after I was ordered to lay on the floor, I gave the officer my ID card. If at any time I was to participate in that, then why didn't I run out of the messhall like uh alot of other people supposedly did? I did not get involved at all. I

never even got to eat. I just sat there until it was over and I was ordered to lay down on the floor. That's the only thing I did. I'm not denying being in the messhall, because I did go in there to eat. But I did not assault anybody and I did not throw anything.

After some follow-up questioning, Homrighouse mentioned two other reports, each based on information "received through a confidential informant," stating that Zavaro was observed throwing trays. Zavaro responded that he never had a tray; he was sitting at a table with nothing but a water pitcher, with no trays nearby.

Finally, Homrighouse considered Zavaro's record: "I'm looking at your record, and I'm not going to elaborate on it, but suffice it to say that it's ri[f]e with charges of assault, threats, weapons, possessions, uh interference with an officer, you did, you did alot of keeplock time,—box time."

Homrighouse found Zavaro guilty of violating Rule 104.10, explaining:

[The] evidence I relied upon was the misbehavior report of Sgt. Smith, wherein he states that you were identified as being in the messhall by your ID card and while being decontaminated. And also your own admission to being present in the messhall, and the statements of confidential informants stating that you were personally observed throwing trays at Correction Officer Severance and throwing other objects.

Homrighouse imposed on Zavaro a penalty of two years of confinement in the Special Housing Unit and 180 days' loss of packages, and recommended that Zavaro lose two years of good time. On administrative appeal pursuant to N.Y.C.R.R. tit. 7, § 254.8 (1992), the penalty was modified to one year in the Special Housing Unit and one year's loss of good time. Zavaro challenged the disciplinary determination in an Article 78 proceeding in the New York courts. The Appellate Division, finding that the officer did not assess the reliability of the informants and that the other evidence "established nothing more than that Zavaro was in the mess hall," annulled the determination against Zavaro and ordered all references to the proceeding expunged. *Matter of Suvill v. Coughlin*, 160 A.D.2d 1160, 1161, 554 N.Y.S.2d 365, 366–67 (1990), *rev'd on other grounds*, 77 N.Y.2d 642, 572 N.E.2d 23, 569 N.Y.S.2d 582 (1991).

Zavaro brought this action *pro se* and *in forma pauperis* under section 1983, alleging that his constitutional rights had been violated at the disciplinary hearing, and seeking injunctive and compensatory relief against hearing officer Homrighouse and Thomas Coughlin, Commissioner of the New York Department of Correctional Services. Zavaro, now represented by counsel, moved for summary judgment. Defendants cross-moved for summary judgment.

The district court granted defendants' motion insofar as Zavaro sought to impose liability on Coughlin in his individual capacity or on either defendant in his official capacity. *Zavaro v. Coughlin*, 775 F.Supp. 84, 87 (W.D.N.Y.1991). As to Zavaro's claim against Homrighouse in his individual capacity, however, the court granted summary judgment for the plaintiff. Concluding from the undisputed record that "Captain Homrighouse adjudicated plaintiff guilty of violating prison rules on the basis of patently deficient evidence—on uncorroborated statements of confidential informants and signed statements of eye witnesses which contain *absolutely no* reference to the plaintiff," the court found "that Homrighouse's actions unequivocally failed to meet even the minimum due process standards which the law has set for such prison proceedings." *Id.* at 89. The court rejected Homrighouse's proffered defense of qualified immunity, finding as a matter of law that Homrighouse "could not reasonably have believed that his actions did not violate the plaintiff's rights." *Id.* at 90. The parties later stipulated to the amount of damages—$18,000—and judgment was entered in that amount.

## DISCUSSION

Homrighouse's sole argument on appeal is that qualified immunity shields him from liability for his conduct because he could reasonably have believed that some evidence supported his finding that

Zavaro participated in the riot. While appellant is correct that qualified immunity protects a hearing officer who could reasonably conclude that some evidence supports that officer's prison disciplinary determination, he is incorrect in thinking that such immunity protects him here, where there was no reliable evidence whatsoever of the inmate's guilt. That the Great Meadow Correctional Facility suffered a troubling outbreak of violence on July 31, 1988, we have no doubt. No one will dispute that those who participated in the riot should be punished for their conduct. What we cannot abide, however, is a cavalier attitude by prison officials about whether a particular inmate in fact participated in the riot.

## I. *Due Process*

Prisoners retain rights under the Due Process Clause of the Fourteenth Amendment, but those rights are somewhat muted by the institutional concerns inherent in a correctional system. The Supreme Court, in *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), explained that "the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to appropriate restrictions imposed by the nature of the regime to which they have been lawfully committed." The Court concluded that "there must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.*

■ Notwithstanding such deference to the institutional needs of prison officials, the Supreme Court has made it clear that those officials may not infringe on prisoners' protected liberty interests through disciplinary proceedings without a certain quantum of evidence to support their determinations. "Requiring a modicum of evidence to support a decision ...," the Court has explained, "will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens." *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768,

2774, 86 L.Ed.2d 356 (1985). Therefore, due process requires "that there be some evidence to support the findings made in the disciplinary hearing." *Id.* at 457, 105 S.Ct. at 2775. *See also Freeman v. Rideout*, 808 F.2d 949, 954–55 (2d Cir.1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

The facts of *Superintendent v. Hill* provide a useful starting point for determining whether "some evidence" existed in this case. A prison guard heard some commotion in a walkway, and upon investigating, discovered an inmate with a swollen eye and a bleeding mouth. He saw three inmates fleeing together down the walkway. There were no others in the enclosed area. 472 U.S. at 447–48, 456, 105 S.Ct. at 2769–70, 2774. The guard concluded that the three inmates had acted as a group in assaulting the victim, and so testified at their disciplinary hearings. The inmates were found guilty of violating prison regulations. *Id.* at 448, 105 S.Ct. at 2770. On those facts, the Supreme Court held that even though the evidence was "meager," it sufficed to meet the minimum due process standard. *Id.* at 457, 105 S.Ct. at 2775.

■ The "meager" evidence in *Hill* looks overwhelming in comparison to the evidence against Zavaro. Whereas the *Hill* inmates were observed in an enclosed walkway, Zavaro was observed in a large mess hall. In comparison to the three inmates in *Hill*, Zavaro was in a room with at least one hundred inmates. The *Hill* inmates fled; Zavaro waited and lay on the floor as instructed.

Were the number of inmates far fewer and the enclosed area far smaller, then perhaps witnesses' statements that "every inmate" participated in the riot would constitute "some evidence" of a particular inmate's guilt, within the meaning of *Hill.* However, such all-inclusive statements about the conduct of one hundred or so inmates in a mess hall—especially coming from guards who were at the time being assaulted—are so blatantly implausible when taken literally that they do not constitute even "some evidence" of a particular inmate's guilt. The guards' sweeping

statements can only be understood to mean that the guards observed very widespread participation in the riot, not that every one of the hundred or so inmates, without exception, took part.

The guards' statements, then, did nothing more than place Zavaro in the mess hall at the time of a riot with widespread participation. They offered nothing to point to Zavaro as a participant, or to call into question his assertion that he remained at his table, without throwing anything—or even having a tray to throw—or assaulting anybody or even rising from his chair, until ordered to lie down on the floor.[1] We find that the evidence in the record failed to meet the "some evidence" standard established by the Supreme Court in *Hill,* and that Homrighouse's determination that Zavaro participated in the riot, and the consequent punishment of Zavaro, violated Zavaro's rights under the Due Process Clause of the Fourteenth Amendment.

## II. *Qualified Immunity*

█ Homrighouse contends that even if he violated Zavaro's constitutional rights, qualified immunity shields him from liability.[2] "The doctrine of qualified immunity serves to shield public officials ... from liability in § 1983 actions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Purnell v. Lord,* 952 F.2d 679, 683–84 (2d Cir.1992) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *see also Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The right must be clearly established; in other words, "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see also Purnell,* 952 F.2d at 684. We have previously articulated the standard for establishing a defense of qualified immunity.

A defendant may establish a right to qualified immunity by showing that "it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution;" or that "it was not clear at the time of the acts at issue that an exception did not permit those acts;" or that "it was objectively reasonable for [the officer] to believe that his acts did not violate [plaintiff's] rights."

*Krause v. Bennett,* 887 F.2d 362, 368 (2d Cir.1989) (quoting *Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987)).

█ Applying this standard to the present case, we conclude that the inmate's right not to be adjudicated guilty without some evidence to support that finding was clearly established by 1988, when the hearing occurred. The Supreme Court's 1985 decision in *Hill* left no doubt that due process requires "that there be some evidence to support the findings made in the disciplinary hearing." *Hill,* 472 U.S. at 457, 105 S.Ct. at 2775. We further conclude that, on this record, no reasonable hearing officer could have found that any exception applied or that there was some evidence to support finding Zavaro guilty. Other than statements from informants of unassessed reliability, *see Russell v. Coughlin,* 774 F.Supp. 189, 199–200 (S.D.N.Y.1991) (holding that a hearing officer is not entitled to qualified immunity for

---

**1.** Homrighouse no longer relies on the information from the confidential informants because, as he now concedes, "there was *no* evidence whatsoever of their reliability." Appellant's Brief at 11 n. 5 (citing *Wolfe v. Carlson,* 583 F.Supp. 977, 982 (S.D.N.Y.1984)). *See also Russell v. Coughlin,* 774 F.Supp. 189, 196 (S.D.N.Y. 1991); *Vasquez v. Coughlin,* 726 F.Supp. 466, 470–71 (S.D.N.Y.1989).

**2.** Appellant does not argue that he is absolutely immune. We note that although absolute immunity extends to some executive officials' qua-

si-judicial acts, *see Butz v. Economou,* 438 U.S. 478, 514, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978), absolute immunity does not extend to officers presiding at prison disciplinary hearings, in the absence of the procedural safeguards identified by the Supreme Court in *Butz. Cleavinger v. Saxner,* 474 U.S. 193, 203–06, 106 S.Ct. 496, 501–03, 88 L.Ed.2d 507 (1985). Rather, prison disciplinary hearing officers are protected only by qualified immunity. *Id.* at 206, 106 S.Ct. at 503.

**1154**

violating inmate's clearly established right to an independent assessment of informants' reliability), the evidence simply placed Zavaro at the location of a riot. Only an anxiousness to cast an all-encompassing disciplinary net, and a corresponding disregard for the guilt or innocence of particular inmates, could explain the disciplining of Zavaro for his presence in the mess hall. In sum, Captain Homrighouse could not have reasonably believed that his conduct did not violate Zavaro's constitutional rights, and Homrighouse's defense of qualified immunity was properly rejected by the district court.

Appellant would have us believe that affirming the award of liability in this case would place an unacceptable obstacle in the way of orderly prison administration. We agree with and are required to follow the Supreme Court's precepts on the subject: "It is the business of prison officials, of course, to maintain order within their institutions. But this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security." *Cleavinger v. Saxner,* 474 U.S. 193, 207, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985).

Accordingly, the judgment of the district court is affirmed.