Jose **PADILLA**, by Donna R. **NEWMAN**, as next friend, Petitioner,

v.

Donald **RUMSFELD**, Respondent.

No. 02 CIV. 4445(MBM).

United States District Court, S.D. New York.

March 11, 2003.

Donna R. Newman, Esq., Andrew G. Patel, Esq., New York City, for Petitioner.

James B. Comey, Esq., United States Attorney for the Southern District of New York City, Paul D. Clement, Esq., Deputy Solicitor General, David B. Salmons, Sri Srinivasan, Assistants to the Solicitor General, U.S. Department of Justice, Office of the Solicitor General, Jonathan L. Marcus, Esq., Attorney, Department of Justice, U.S. Department of Justice, Washington, DC, Eric B. Bruce, Esq., Assistant U.S. Attorney, New York City, for Respondent.

Donald G. Rehkopf, Esq., Law Offices of Brenna & Brenna, Rochester, NY, for Amici Curiae The New York State Association of Criminal Defense Lawyers and The National Association of Criminal Defense Lawyers.

## OPINION AND ORDER

MUKASEY, District Judge.

On December 4, 2002, this court issued an Opinion and Order (the "Opinion") which held, among other things, that petitioner Jose Padilla would be permitted to consult with counsel "in aid of his petition and, in particular, in aid of responding to the Mobbs Declaration [which described the factual basis for his detention] should he choose to do so." *Padilla ex rel. Newman v. Bush,* 233 F.Supp.2d 564, 603 (S.D.N.Y.2002). The Opinion gave the parties until December 30, 2002, to work out by agreement the conditions for compliance with that holding, and stated explicitly that if the parties could not agree, the court would impose those conditions itself. *Id.* at 605, 610.

This case is now before the court on the government's motion to reconsider that holding. For the reasons set forth below, the motion to reconsider—although untimely and otherwise vulnerable to objection—is granted. However, upon reconsideration, the holding is adhered to.

### I.

The government's motion, filed January 9, 2003, is styled "Respondents' Motion for Reconsideration In Part." It includes a sworn declaration, described more fully below, setting forth facts in addition to those the government submitted previously, said to bear on whether Padilla should be permitted to consult with counsel. There is a local civil rule applicable to motions for reargument or reconsideration. That rule requires that such motions be made within ten days after determination of the original motion, and bars affidavits unless authorized by the court.[1] Because the gov-

---

1. Local Civil Rule 6.3 ("Motions for Reconsideration or Reargument") reads as follows:

A notice of motion for reconsideration or reargument shall be served within ten (10) days after the docketing of the court's deter-

ernment's motion was filed more than a month after the Opinion, and includes an affidavit without benefit of court order, and because of the casuistry the government has employed in an effort to justify its disregard of the cited rule, there is need to review both the briefing that preceded the Opinion, and the procedural steps that followed it.

After the parties had submitted their initial briefs addressed to the underlying petition, they submitted additional briefs, as the court requested during a conference on October 21, 2002, addressing the question of whether Padilla should be permitted to consult with counsel. The government's arguments in opposition, as summarized in the Opinion, were that such consultation would "jeopardize the two core purposes of detaining enemy combatants—gathering intelligence about the enemy, and preventing the detainee from aiding in any further attacks against America." *Padilla*, 233 F.Supp.2d at 603 (quoting Respondents' Resp. to This Ct's 10/21/02 Order at 6) (internal quotation marks omitted). That is, consultation would interfere with questioning, and present the opportunity to use counsel as intermediaries to send messages to others. *Id.* Those arguments were answered in the Opinion. *Id.* at 603–05.

The Opinion directed respondent Secretary of Defense Donald Rumsfeld to let Padilla meet with counsel "for the purpose of submitting to the court facts bearing upon his petition, under such conditions as the parties may agree to, or, absent agreement, such conditions as the court may direct so as to foreclose, so far as possible,

the danger that Padilla will use his attorneys for the purpose of conveying information to others." *Id.* at 605. The parties were directed to "discuss and arrange the conditions for defense counsel's consultation with Padilla" and to attend a conference on December 30, 2002, "to report on the results of those discussions and arrangements." *Id.* at 610. Earlier, the Opinion had noted specifically that the purpose for granting Padilla access to counsel was to permit him to present facts to the court in connection with his petition; "no general right to counsel in connection with questioning has been hypothesized here, and thus the interference with interrogation would be minimal or non-existent." *Id.* at 603.

On December 23, 2002, the government sent me a letter intended to "(1) update the Court on the parties' discussions about the consultation between Padilla and his counsel ordered in the December 4, 2002 Opinion; and (2) request a brief adjournment of the conference scheduled to take place on December 30." (Letter of Bruce to the Court of 12/23/02 ("12/23 Letter") at 1) That letter reported that, as directed in the Opinion, the parties had met "to discuss the conditions [Padilla's counsel] . . . are likely to propose." (*Id.*) I was told that "the parties are not near to agreeing on a set of conditions for the meeting, but it has been helpful to begin to discuss particulars." (*Id.*) The government informed me of its belief "as a result of hearing the defense proposals that it will be necessary, at a minimum, to present the Court and defense counsel with additional

mination of the original motion. There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. The time periods for the service of answering and reply memoranda, if any, shall be governed by Local Civil Rule 6.1(a) or (b), as in the case of the original motion. No oral argument shall be heard unless the court directs that the matter shall be reargued orally.

S.D.N.Y. & E.D.N.Y. R. 6.3.

factual information to enable the Court to assess the feasibility of different conditions that may be proposed." The government disclosed also that it was "continuing to consider its position with respect to the consultation, including the possibility of requesting that the Court weigh additional information in reconsidering aspects of its December 4 Opinion." (*Id.*)

The government noted as well the desirability of having its, deliberations completed by the time of the conference and the difficulty of conducting those deliberations during the holiday season (*id.*), and accordingly asked that the conference be adjourned "to either January 13th, 14th, or 15th, by which time we expect to have finalized the Government's position and submitted materials in writing" (*id.* at 2). The letter reported that Padilla's counsel had consented "to the request for an adjournment" (*id.*), but failed to mention that Padilla's counsel had not agreed to as long an adjournment as the government asked, or to any further written submission.

Excluding the weekends after December 4, 2002, *see* Fed.R.Civ.P. 6(a),[2] the time for a motion to reargue or reconsider had expired by the time the 12/23 Letter was submitted.

On December 24, 2002, the court issued an order adjourning the conference to January 15 and giving the government until January 8 to serve its "written submission." On January 8, the United States Court of Appeals for the Fourth Circuit issued an opinion in *Hamdi v. Rumsfeld,*

316 F.3d 450 (4th Cir.2003), and the government asked for a one-day extension of the deadline for that "submission," which the court granted. In that case, the Fourth Circuit treated a question certified for appeal by the district court where Yaser Hamdi, an American citizen, had filed a habeas corpus petition: "whether a declaration by a Special Advisor to the Under Secretary of Defense for Policy[3] setting forth what the government contends were the circumstances of Hamdi's capture was sufficient by itself to justify his detention." *Id.* at 459.

The Fourth Circuit was careful to limit its decision, discussed further below, to the issues presented by the facts before it, and specifically disavowed any intention to speak to the circumstances presented in Padilla's case:

Given the concerns discussed in the preceding sections, any broad or categorical holdings on enemy combatant designations would be especially inappropriate. We have no occasion, for example, to address the designation as an enemy combatant of an American citizen captured on American soil or the role that counsel might play in such a proceeding. *See, e.g., Padilla v. Bush,* 233 F.Supp.2d 564 (S.D.N.Y.2002). We shall, in fact, go no further in this case than the specific context before us—that of the undisputed detention of a citizen during a combat operation undertaken in a foreign country and a determination by the

2. The rule reads, in pertinent part, as follows:
   In computing any period of time prescribed or allowed by the local rules of any district court ... the day of the act, event, or default from which the designated period of time begins to run shall not be included.... When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

Fed.R.Civ.P. 6(a).
   By that standard, the government's time to move for reargument or reconsideration expired on December 18, 2002.

3. That declarant was Michael Mobbs, the same declarant as in the case at bar. *See Padilla,* 233 F.Supp.2d at 572.

executive that the citizen was allied with enemy forces.

*Id.* at 465.

On January 9, the government made its "written submission," which turned out to be a "Motion for Reconsideration In Part." The "part" of the Opinion the government seeks to have reconsidered is the holding that Padilla may confer with his lawyers in aid of submitting facts to the court in support of his petition. Appended to the government's memorandum in support of the motion is the declaration of Vice Admiral Lowell E. Jacoby, Director of the Defense Intelligence Agency, sworn to January 9, 2003 ("Jacoby Declaration"), supplemented—as was the Mobbs Declaration discussed in the Opinion—by a sealed version containing additional details (the "Sealed Jacoby Declaration").

As set forth more fully below, the Jacoby Declaration sets forth the factual predicate for one of the two government arguments advanced in support of the motion for reconsideration. Those two arguments are (i) permitting Padilla to consult with counsel could set back by months the government's efforts to bring psychological pressure to bear upon Padilla in an effort to interrogate him, and could compromise the government's interrogation techniques; and (ii) in any event, consultation with counsel is unnecessary in view of the level of proof fixed by the court in the Opinion as the standard for deciding whether the government may continue to hold Padilla without formal charges—"some evidence" to justify the conclusion that he is an enemy combatant, *Padilla,* 233 F.Supp.2d at 608.[4]

On January 13, Padilla responded to the government's motion by (i) pointing out that it was filed past the deadline imposed by Local Civil Rule 6.3, and violated that rule as well insofar as it included a sworn statement—the Jacoby Declaration—submitted without court permission, and (ii) disputing the two substantive arguments advanced in the government's motion. On January 15, at the previously scheduled conference, Deputy Solicitor General Paul D. Clement, representing the government, (i) previewed arguments the government would later tease out at greater length in its papers, to the effect that its submission did not violate Local Civil Rule 6.3 (Tr. of 1/15/03 at 3), or came within some fancied exception to it (*id.* at 5), and (ii) after being asked five times whether the government had any facts to bring to the court's attention in addition to those set forth in the Jacoby Declaration, finally said no (*id.* at 6–7).

The parties were given additional time to brief the issues relating to both the propriety of the government's motion under Local Civil Rule 6.3, and the substance of the motion; that process is now complete.

The reasons for the rule should be apparent. The rule is designed to avoid having a losing party delay resolution of the case, and burden the court, by simply submitting new arguments and facts after its initial submissions have proved inadequate. It is intended to "ensure the finality of decisions and to prevent the practice

4. The government suggests as well that permitting Padilla access to counsel is "anomalous" (Respondents' Mot. for Recons. at 14 n. 5) in view of the holding in the Opinion that one of his lawyers, Donna Newman, Esq., may serve as next friend in this litigation because he is inaccessible, *see Padilla,* 233 F.Supp.2d at 575–78. Allowing her to serve as next friend simply made it possible for her to commence the litigation and to proceed with it as far as necessary. The need for Newman to serve as next friend will end at the point, if it comes, when she has an opportunity to consult with Padilla, and she can resume her status as counsel only.

of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988) (quoting *Lewis v. New York Telephone,* No. 83 Civ. 7129, 1986 WL 1441, at *1 (S.D.N.Y. Jan. 29, 1986)) (internal quotation marks omitted); *see also Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (motion for reargument "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court"); *Primavera Familienstifung v. Askin,* 137 F.Supp.2d 438, 442 (S.D.N.Y.2001) (party may not "advance new facts, issues or arguments not previously presented to the Court" (quoting *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Maryland,* 768 F.Supp. 115, 116 (S.D.N.Y.1991)) (internal quotation marks omitted)).

The government advances essentially two arguments to defend the propriety of its motion: that the motion is not covered by the rule, and that the court and Padilla either invited or consented to the motion. As to the first, the government seizes on the word "determination" in that part of the rule directing that the motion be submitted within ten days after docketing of "the court's determination of the original motion," and argues that there was no "determination" of the access to counsel issue because details remained to be worked out as to how such access would be

had. (Respondent's Opp'n to Mot. to Strike at 2) No offense to the principle of finality of decisions results from the government's motion, it argues, because the court's decision granting Padilla access to counsel was not final. (*Id.* at 4)

The government's arguments here are permeated with the pinched legalism one usually encounters from non-lawyers. The issue of whether counsel would have access to Padilla or not was argued by the parties at the court's specific invitation. The government was permitted to adduce any facts it thought relevant. That issue—access or not—was determined. By the government's standard, there may be no such thing as a "determination" of any motion that calls for subsequent conduct by any party. By the government's logic, even if the court had directed that Padilla's attorneys be permitted to visit with him for a specified number of hours on a specified day, that would not have "determined" the motion if the court failed to specify also the time of day, or the type of room in which they could meet, or whether they could break for lunch, and the like.[5]

Further, the government contends that the court, having invited the parties to confer about the conditions for counsel's access to Padilla, and having said it would impose conditions if the parties could not agree, had invited a "dialogue" (Respondents' Opp'n to Mot. to Strike at 7 (quoting *Polsby v. St. Martin's Press, Inc.,* No. 97 Civ. 690(MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000))), and once there

---

5. The government's argument summons from obscurity an abstruse problem—that because no rule can determine its own application, it may appear that there can be no binding rule—that was picked apart on the philosophical dissecting table toward the middle of the last century by Ludwig Wittgenstein, and since has ceased to vex those inclined to contemplate such matters. *Compare* Ludwig Wittgenstein, *Philosophical Investigations* § 198, at 80e (G.E.M. Anscombe trans., 3rd ed. 1958) ("But how can a rule show me what I have to do at *this* point? Whatever I do is, on some interpretation, in accord with the rule."), *with id.* § 201, at 81e ("[T]here is a way of grasping a rule that is not an interpretation, but which is exhibited in what we call 'obeying the rule' and 'going against it' in actual cases.").

is to be a dialogue, it may include the subject of whether there is to be any access at all.

The government detects in the 12/23 Letter notice of its intent to file the motion at issue here, and seems to suggest that the court and opposing counsel should have as well. Thus, the government points to its advice that "the parties are not near to agreeing on a set of conditions for the meeting [between Padilla and counsel]," that "defense proposals" made it "necessary, at a minimum, to present the Court and defense counsel with additional factual information to enable the Court to assess the feasibility of different conditions that may be proposed," and that the government was "continuing to consider its position with respect to the consultation, including the possibility of requesting that the Court weigh additional information in reconsidering aspects of its December 4[O]pinion." (Respondents' Opp'n to Mot. to Strike at 6 (quoting 12/23 Letter at 1)) Finally, the government cites the court's December 24 order granting it permission to make a further "written submission" as somehow inviting or endorsing what it has done here. (*Id.*)

However, what both the court and Padilla's counsel plainly anticipated was a "dialogue" about how the court's determination would be complied with, not whether it would be complied with. The government's anodyne reference in its 12/23 Letter to "reconsidering aspects of [the court's] December 4 Opinion" (12/23 Letter at 1), buried in a discussion of meetings and proposals and counter-proposals about how to comply with the court's determination, could not serve as notice of an intent to challenge that determination frontally, particularly when the deadline for doing so had already passed and the government had not secured the consent of Padilla's

counsel to make a further written submission.

Although the 12/23 Letter included a "So Ordered" signature line, which now appears to have been intended more as a snare than as a convenience, I did not "So Order" the government's letter. Instead, I entered a separate order simply permitting the government to make a "written submission," presumably—again—one that set forth the facts the government wanted me to consider in determining how it would comply with the previous determination, not whether it would comply with that determination.

What seems to have happened here is that the government hoped the Fourth Circuit opinion in *Hamdi* would help its position in this case, and tried to slow the progress of this case until that opinion was issued. When that hope was disappointed, the government resorted to filing the current motion, notwithstanding Local Rule 6.3. The question before the court is not so much whether or not that motion violates both the letter and the spirit of the rule—it does—as whether or not the rule should control in this case.

The rule itself is prudential. It describes what a court may do to protect itself and parties generally from obstructive litigation practices, not what a court must do in every case. As the government points out, there have been occasions when courts in this district have overlooked failure to comply with the rule when there were good reasons to do so (Respondents' Opp'n to Mot. to Strike at 10 n. 3), as there are here. First, as the government points out, national security issues have been raised in connection with this motion. Those issues appear, at least facially, to warrant consideration. Second, to the extent that the rule is intended to deter, or at least avoid rewarding, bad behavior, I think it unlikely that those responsible for

the disappointing conduct addressed above will soon repeat it. *Cf. Love v. Kwitny,* 772 F.Supp. 1367, 1369 (S.D.N.Y.1991) (plaintiff found to have filed meritless motion "but will suffer no sanction beyond the sting of that finding").

Notwithstanding that the government's motion violates the rule, reconsideration will be granted.

## II.

■ As noted above, the Jacoby Declaration, supplemented by the Sealed Jacoby Declaration, provides the factual predicate for the government's motion. It sets forth the substantial qualifications of Admiral Jacoby, acquired during his 30–year career as a commissioned officer, including service in numerous supervisory intelligence-gathering positions and culminating in his current position as Director of the Defense Intelligence Agency ("DIA") with a staff of 7000 civilian and military employees worldwide, who gather intelligence for both civilian and military departments of government, including the President and the Secretaries of State and Defense. It describes in broad terms the intelligence-gathering process and the importance of maintaining its continuity and integrity. However, the principal relevance of the Jacoby Declaration to the issue at hand—whether Padilla should be permitted to consult with counsel—is its description of the interrogation techniques used by the DIA, and its assessment of the danger of interrupting such interrogation to permit Padilla to consult with counsel. The Jacoby Declaration describes as follows the DIA's interrogation technique:

> DIA's approach to interrogation is largely dependent upon creating an atmosphere of dependency and trust between the subject and the interrogator. Developing the kind of relationship of trust and dependency necessary for effective interrogations is a process that can take a significant amount of time. There are numerous examples of situations where interrogators have been unable to obtain valuable intelligence from a subject until months, or even years, after the interrogation process began.

> Anything that threatens the perceived dependency and trust between the subject and interrogator directly threatens the value of interrogation as an intelligence-gathering tool. Even seemingly minor interruptions can have profound psychological impacts on the delicate subject-interrogator relationship. Any insertion of counsel into the subject-interrogator relationship, for example—even if only for a limited duration or for a specific purpose—can undo months of work and may permanently shut down the interrogation process. Therefore, it is critical to minimize external influences on the interrogation process.

(Jacoby Decl. at 4–5)

The Jacoby Declaration also stresses the need for ongoing intelligence, as new information is learned that may suggest new lines of inquiry to those already in custody. (*Id.* at 5–6) Assessing the intelligence value of Padilla, Admiral Jacoby reviews in summary fashion the allegations in the Mobbs Declaration relating to Padilla's contacts and training with al Qaeda, and concludes that Padilla "could potentially provide information" on about a dozen subjects, including not only the so-called "dirty bomb" plot in which Padilla is alleged to have been involved, but also more general subjects such as al Qaeda training, planning, recruitment, methods and operations in several countries, including the United States. (*Id.* at 7–8) In addition, Admiral Jacoby states that the information Padilla "may be able to provide is time-sensitive and perishable." (*Id.* at 8) The Sealed Jacoby Declaration sets forth in

greater detail information linking Padilla to al Qaeda, and thereby confirms the nature of the information Padilla could provide to interrogators. (Sealed Jacoby Decl. at 8–10)

The Jacoby Declaration and the Sealed Jacoby Declaration contain the following assessment of the *"Potential Impact of Granting Padilla Access to Counsel"*:

> Permitting Padilla any access to counsel may substantially harm our national security interests. As with most detainees, Padilla is unlikely to cooperate if he believes that an attorney will intercede in his detention. DIA's assessment is that Padilla is even more inclined to resist interrogation than most detainees. DIA is aware that Padilla has had extensive experience in the United States criminal justice system and had access to counsel when he was being held as a material witness. These experiences have likely heightened his expectations that counsel will assist him in the interrogation process. Only after such time as Padilla has perceived that help is not on the way can the United States reasonably expect to obtain all possible intelligence information from Padilla.

> Because Padilla is likely more attuned to the possibility of counsel intervention than most detainees, I believe that any potential sign of counsel involvement would disrupt our ability to gather intelligence from Padilla. Padilla has been detained without access to counsel for seven months—since the [Department of Defense] took control of him on 9 June 2002. Providing him access to counsel now would create expectations by Padilla that his ultimate release may be obtained through an adversarial civil litigation process. This would break—probably irreparably—the sense of de-

> pendency and trust that the interrogators are attempting to create.

> At a minimum, Padilla might delay providing information until he believes that his judicial avenues have been exhausted. Given the nature of his case, his prior experience in the criminal justice system, and the length of time that has already elapsed since his detention, Padilla might reasonably expect that his judicial avenues of relief may not be exhausted for many months or years. Moreover, Padilla might harbor the belief that his counsel would be available to assist him at any point and that seven months is not an unprecedented time for him to be without access to counsel.

> Any such delay in Padilla's case risks that plans for future attacks will go undetected during that period, and that whatever information Padilla may eventually provide will be outdated and more difficult to corroborate.

> Additionally, permitting Padilla's counsel to learn what information Padilla may have provided to interrogators, and what information the interrogators may have provided Padilla, unnecessarily risks disclosure of the intelligence sources and methods being employed in the War on Terrorism.

(Jacoby Decl. at 8–9; Sealed Jacoby Decl. at 12–13) [6]

Notwithstanding the importance that Admiral Jacoby attaches to obtaining information he suggests Padilla might know, and the serious consequences he suggests could flow from permitting Padilla to consult counsel, both the Jacoby Declaration and the Sealed Jacoby Declaration are silent on the following two subjects: (i) the particulars of Padilla's actual interrogation thus far, and what they suggest about the

---

6. The Sealed Jacoby Declaration contains two additional sentences, not quoted above, that add nothing of substance to what is set forth in the Jacoby Declaration.

prospect of obtaining additional information from him, and (ii) when, if at all, intelligence personnel have ever experienced effects of an interruption in interrogation like the effects predicted in both of the excerpts from the Jacoby Declaration quoted above. As to the first of these gaps—omission of information about the actual questioning of Padilla—the Jacoby Declaration discloses that that omission is purposeful (Jacoby Decl. at 1), but government counsel disclose only that information from the interrogations was excluded "in order to maintain separation between the national security interrogations and this litigation." (Respondents' Opp'n to Mot. to Strike at 14 n. 6)

The government does not explain the need for that separation, and so I am left to guess what it might be. One possible explanation might be a desire to avoid polluting any future prosecution of Padilla with information obtained as the result of his interrogation without counsel, although there are ways to do that without separating the interrogation entirely from this litigation. In fact, it is not unheard of for information that might potentially invalidate a prosecution to be walled off within a single prosecutor's office, and for the prosecution to proceed without incident. *See, e.g., Ford v. United States*, 756 F.2d 249, 254 (2d Cir.1985) (government promise to create "Chinese Wall" so as not to use testimony of witness spouse against nonwitness spouse held sufficient to meet claim of privilege by testifying spouse); *United States v. Seregos*, 655 F.2d 33, 37 (2d Cir.1981) (prosecutor and agent insulated themselves from proceeding in which immunized testimony was given, and therefore evidence was free of taint that would have resulted from exposure to such testimony).

Another possible explanation for this omission may be concern by the government that if it discloses only so much of the information relating to Padilla's interrogation as helps its position in this litigation, it might be forced to disclose more in the interests of fairness. *Cf. United States v. Nobles*, 422 U.S. 225, 239-40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (upholding power of trial court to condition testimony of defendant's investigator about interviews with prosecution witnesses upon production of investigator's full report, notwithstanding claim of work product privilege); *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir.1950) (L.Hand, C.J.) (government could not fill a gap in its own case with evidence that it would not then disclose to defendant). If that is the reason for the omission, the government's choice may be understandable. However, understandable or not, the information is not there, and so, as the government acknowledges, there is a certain "lack of concreteness" in the Jacoby Declaration. (Respondents' Opp'n to Mot. to Strike at 14 n. 6)

The government does not allude to, let alone explain, its omission of any examples of the sort of setback Admiral Jacoby projects in the event Padilla is allowed to consult counsel in aid of responding to the Mobbs Declaration. It may be that, if such examples exist, their disclosure would present the same problems as might be presented by disclosure of the substance of Padilla's interrogation. In any event, this information too is absent from the Jacoby Declaration.

Although I would not be so bold as to substitute my own judgment for Admiral Jacoby's on any of the numerous intelligence-related topics in his declaration, including the importance of intelligence gathered from al Qaeda prisoners and the proper technique for conducting an interrogation, when it comes to his forecast about how Padilla might react to even a

brief interruption in his interrogation, it is important to recognize that that forecast is speculative—as is clear from repeated use of such words as "might" and "could"—absent any information about either Padilla's actual interrogation or information about interruptions in past interrogations that would suffice to show whether they are truly analogous to the case at hand. Moreover, the forecast speculates not about an intelligence-related matter, in which Admiral Jacoby is expert, but about a *matter of human nature*—Padilla's in particular—in which, most respectfully, there are no true experts.

Here it may be useful to recall Padilla's background. Admiral Jacoby describes Padilla, with becoming understatement, as someone who "has had extensive experience in the United States criminal justice system" (Jacoby Decl. at 8); the Opinion noted that Padilla had been convicted of murder and weapons possession, and had served time in jail for both before he left the country, *Padilla,* 233 F.Supp.2d at 572. That is to say, even before Padilla achieved his current status as a suspected terrorist, he was a criminal, and criminals are people with whom this court has at least as much experience as does Admiral Jacoby, and perhaps more.

Admiral Jacoby speculates at some length on how long Padilla might hold out, suggesting at one point that even if Padilla heard nothing about this proceeding, because of the "nature of his case, his prior experience in the criminal justice system, and the length of time that has already elapsed since his detention, Padilla might reasonably expect that his judicial avenues of relief may not be exhausted for many months or years." (Jacoby Decl. at 8) However, nowhere does Admiral Jacoby discuss the possibility that if Padilla consulted with counsel, made whatever submission he was inclined to make, if any, and lost in short order, as he well might under a "some evidence" standard, the assured hopelessness of his situation would quickly become apparent to him, particularly in view of his "extensive experience in the United States criminal justice system" (*id.*), and he might then seek to better his lot by cooperating with his captors.[7] The advantages to the government of accelerating the date that the prospect of certain confinement closes in on Padilla actually might outweigh the advantages of simply waiting until he gives up hope on his own, which Admiral Jacoby has conceded could take years.

At a minimum, if the government had permitted Padilla to consult with counsel at the outset, this matter would have been long since decided in this court, and this case could have been before the Second Circuit, which is fully capable of acting on an expedited basis when necessary, *see, e.g. In re NextWave Pers. Communications, Inc.,* 200 F.3d 43, 50 (2d Cir.1999) (case considered on expedited basis), par-

---

7. To the extent that the experience of federal courts under the U.S. Sentencing Guidelines is any indication, it suggests that those facing the near certain prospect of custody have a fine appreciation of how to cut their losses. From 1970 until 1987, the year in which the Sentencing Guidelines went into effect, the rate of guilty pleas rose gradually, only about 2% from 84% to 86%. Under the pre-Guidelines system, the length of a sentence was entirely up to the judge and avoidance of jail always at least a theoretical possibility. Be-

ginning in 1988, the year after the Guidelines were instituted, through 2002, under a Guidelines regimen in which jail in the event of conviction is a certainty that can be minimized only by a guilty plea and eliminated only by cooperation with the government, the rate has risen more than 10%, to 96.6%. Chart, Mode of Conviction by Sentencing Year (on file with court) (prepared by Office of Policy Analysis, U.S. Sentencing Commission).

ticularly when important issues of public policy are involved, *see United States v. N.Y. Times Co.*, 444 F.2d 544 (2d Cir.) (en banc) (per curiam) (argued June 22, 1971; decided June 23, 1971), *rev'd*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). *But see id.* at 755 (Harlan, J., dissenting) ("The time which has been available to us, to the lower courts, and to the parties has been wholly inadequate for giving these cases the kind of consideration they deserve."). The Supreme Court, too, can expedite treatment of cases when necessary. *See, e.g., Utah v. Evans*, 534 U.S. 1119, 122 S.Ct. 932, 151 L.Ed.2d 894 (2002) (granting a motion to set an expedited schedule for briefing and oral argument). Indeed, that Court may consider a case even before a Court of Appeals has ruled on it. *See* 28 U.S.C. § 1254 (2000) (allowing review of a case pending in a Court of Appeals by writ of certiorari "before or after rendition of judgment or decree"); Sup.Ct. R. 11 (review of a case still pending in a Court of Appeals will occur "only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court"). *Ex Parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942), the case that provided principal support for the central holding in the Opinion—that the President's order to detain Padilla as an unlawful combatant is an authorized and proper exercise of his powers as Commander in Chief, *Padilla*, 233 F.Supp.2d at 593–96—was decided on such an expedited basis. In *Quirin*, the Court first allowed petitioners to argue for leave to file habeas corpus petitions directly in the Supreme Court after the District Court for the District of Columbia denied applications to file the petitions. The Court heard such argument from petitioners "[i]n view of the public importance of the questions raised by their petitions and of the duty which rests on the courts, in

time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty." *Quirin*, 317 U.S. at 19, 63 S.Ct. 1. In the midst of litigating that issue before the Supreme Court, the *Quirin* petitioners perfected an appeal to the D.C. Circuit as well and promptly filed a petition for certiorari before judgment was rendered in the Circuit. *Id.* at 19–20, 63 S.Ct. 1. I would not presume to predict that this case would qualify for such treatment, but in view of the urgent tone of certain portions of the Jacoby Declaration, it seems at least reasonable to point out the availability of these procedures.

The point of the above discussion is not to show that Admiral Jacoby's prediction of adverse consequences from permitting Padilla to have contact with lawyers is wrong. Rather, the point is that although that prediction is plausible, it is only plausible. There are other equally plausible scenarios, at least some of which, suggested above, would be far more beneficial to the government than the prospect of waiting while Padilla, conceded to be a seasoned veteran of imprisonment, toughs it out for whatever period of time he may think someone on the outside might help him. It is a paradox of the government's own making that what prevents Padilla from becoming aware of the possibility that his avenues of appeal could be swiftly foreclosed is that he is not permitted to consult with a lawyer.

III.

Even if the predictions in the Jacoby Declaration were reliably more certain than they in fact are, I would not be free simply to take the counsel of Admiral Jacoby's fears, however well founded and sincere, and on that basis alone deny Padilla access to a lawyer. There is no dispute that Padilla has the right to bring this

petition, and, for the reasons set forth in the Opinion, the statute makes it plain that he has the right to present facts if he chooses to do so. *Padilla,* 233 F.Supp.2d at 599–600. As also set forth in the Opinion, there is no practical way for Padilla to vindicate that right other than through a lawyer, and the court has the power to direct that he be permitted to consult a lawyer to that end. *Id.* at 602–05.

That brings us to the government's second argument. The government contends that the standard of proof adopted by the court—"some evidence"—moots any requirement in the statute that Padilla be heard because that standard of proof "focuses exclusively on the evidence relied on by the executive" (Respondents' Mot. for Recons. at 10)—*i.e.,* requires only that the court consider facts known to the President, as set forth in the Mobbs Declaration, to determine whether there is "some evidence" that the President was exercising his constitutional prerogatives when he ordered that Padilla be detained as an enemy combatant. Whatever might be Padilla's own factual showing, the government contends, it is beside the point.

Contrary to the government's view, use of the "some evidence" standard to decide the lawfulness of Padilla's detention does not mean that he need be given no opportunity to present facts in connection with his petition. Rather, as set forth below, I cannot confirm that Padilla has not been arbitrarily detained without giving him an opportunity to respond to the government's allegations.

■ Arbitrary deprivation of liberty violates the Due Process Clause, *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), which "applies to all 'persons' within the United States," *Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The purpose of the "some evidence" standard is to assure that the executive has not arbitrarily deprived a person of liberty. *See Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (there is "some evidence" to support a factual determination when "the record is not so devoid of evidence that the findings [are] without support or otherwise arbitrary"). Thus, in *Hill,* the Court held that the Due Process Clause requires that a prison disciplinary board's decision to revoke an inmate's good time credit be supported by "some evidence." *Id.* at 455, 105 S.Ct. 2768; *see also United States ex rel. Vajtauer v. Comm'r of Immigration,* 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560 (1927) ("Deportation without a fair hearing or on charges unsupported by any evidence is a denial of due process which may be corrected on *habeas corpus.*").

No court of which I am aware has applied the "some evidence" standard to a record that consists solely of the government's evidence, to which the government's adversary has not been permitted to respond. Rather, courts have applied that standard to review the decisions of tribunals where petitioners had a chance to contest the evidence against them. For example, in *Hill,* each inmate challenging his punishment had a chance to present exculpatory evidence at a disciplinary hearing. *See Hill v. Superintendent, Mass. Corr. Inst.,* 392 Mass. 198, 466 N.E.2d 818, 820 (1984) ("The disciplinary board held a separate hearing on the charges against each plaintiff. At each hearing, some exculpatory evidence was introduced."). The disciplinary board's hearing generated a record that was used by the reviewing court to determine that the board's decision had evidentiary support. *Hill,* 472 U.S. at 456–57, 105 S.Ct. 2768; *see also, e.g., Dickinson v. United States,* 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed.

132 (1953) (party challenging selective service determination allowed to testify and submit evidence at local board hearing); *Eagles v. U.S. ex rel. Samuels,* 329 U.S. 304, 310–11, 67 S.Ct. 313, 91 L.Ed. 308 (1946) (several hearings accorded party challenging selective service determination); *Vajtauer,* 273 U.S. at 106, 47 S.Ct. 302 (alien challenging deportation had opportunity to testify at hearing and was represented by counsel).

Because the "some evidence" standard has been applied after adversary proceedings at which both sides had a chance to present evidence that was then evaluated, reviewing courts have not found it necessary to examine the entire record in order to ensure that deprivations of liberty were not arbitrary. Prison disciplinary proceedings frequently have generated such cases; *Hill* is one of them. The Supreme Court in *Hill* found that deciding whether the "some evidence" standard is met "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Hill,* 472 U.S. at 455, 105 S.Ct. 2768. "Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455–56, 105 S.Ct. 2768.

Courts reviewing prison disciplinary proceedings after *Hill* have held that "some evidence" does not mean any evidence at all that would tend, however slightly, to make an inmate's guilt more probable. Rather, the evidence must prove the inmate's guilt in some plausible way. *See, e.g., Zavaro v. Coughlin* 970 F.2d 1148, 1152–53 (2d Cir.1992) (evidence that inmate was one of 100 inmates in mess hall during riot in which assaulted prison guards stated "every inmate" had participated not sufficient under the "some evidence" standard to support finding he

actually participated in the riot); *Lenea v. Lane,* 882 F.2d 1171, 1175–76 (7th Cir. 1989) (evidence that inmate had the opportunity to assist escape insufficient to support finding he did so because "[a]lthough 'some evidence' is not much, and obviously ranks far below what would be sufficient in a criminal or civil trial, it still must point to the accused's guilt").

Further, the evidence must carry some indicia of reliability. *Williams v. Fountain,* 77 F.3d 372, 375 (11th Cir.1996) (failure to evaluate credibility of informant statements bars reliance on such statements); *Hensley v. Wilson,* 850 F.2d 269, 276 (6th Cir.1988) (same); *Brown v. Smith,* 828 F.2d 1493, 1495 (10th Cir.1987) (same); *Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987) (statement of informant with no first-hand knowledge insufficient); *Mendoza v. Miller,* 779 F.2d 1287, 1293 (7th Cir.1985) (reliability of confidential informants may be established in any of several ways, but must be established); *see also Bridges v. Wixon,* 326 U.S. 135, 151, 155–56, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (deportation order could not be sustained under some evidence standard when the Attorney General's decision rested on unsworn statements by cooperating witness who denied making them). *Compare, e.g., Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001) (testimony of confidential informant sufficient where circumstances of testimony and informant's history provided indicia of reliability), *with, e.g., Goff v. Burton,* 91 F.3d 1188, 1192 (8th Cir.1996) (informant's testimony did not meet even minimal standards).

Contrary to the government's claim here that no evidence offered by Padilla could affect a determination under the "some evidence" standard, the Seventh Circuit has held, applying *Hill,* that exculpatory evidence from an inmate is relevant to whether the government has met the

"some evidence" standard if such evidence directly undermines the reliability of the government's evidence. *See Meeks v. McBride,* 81 F.3d 717, 720–21 (7th Cir. 1996) (urine test showing drug use insufficient under "some evidence" standard when it bore incorrect prisoner number and inmate established there was more than one person with his name at the institution); *Viens v. Daniels,* 871 F.2d 1328, 1335 (7th Cir.1989) (dictum) ("It is therefore in general immaterial that an accused prisoner presented exculpatory evidence unless that evidence directly undercuts the reliability of the evidence on which the disciplinary authority relied or there are other extraordinary circumstances.").

By the logic of *Hill, Meeks* and *Viens,* Padilla must have the opportunity to present evidence that undermines the reliability of the Mobbs Declaration. Furthermore, inasmuch as Padilla has not yet been heard at all on the subject, he is entitled to present evidence that conflicts with what is set forth in the Mobbs Declaration, and to have that evidence considered alongside the Mobbs Declaration. When I refer to "the logic of *Hill, Meeks* and *Viens,*" I mean only that. Those cases, which dealt with evaluation of evidence gathered in the relatively accessible setting of a prison, cannot be applied mechanically to evaluation of evidence gathered in the chaotic and less accessible setting of a distant battlefield. What allowances will have to be made in applying the logic of those cases will have to abide whatever submission Padilla may choose to make. However, unless he has the opportunity to make a submission, this court cannot do what the applicable statutes and the Due Process Clause require it to do: confirm what frankly appears likely from the Mobbs Declaration but cannot be certain if based only on the Mobbs Declaration—that Padilla's detention is not arbitrary, and that,

because his detention is not arbitrary, the President is exercising a power vouchsafed to him by the Constitution. As set forth in the Opinion, because the only practicable way to present evidence, if he has any and chooses to do so, is through counsel, he must be permitted to consult with counsel.

*Hamdi,* in which the Fourth Circuit found that Yaser Hamdi, an alleged enemy combatant captured in Afghanistan, was "not entitled to challenge the facts presented in the Mobbs declaration," *Hamdi,* 316 F.3d at 476, does not compel a different result, despite the government's strenuous contentions to the contrary. In *Hamdi,* the Fourth Circuit held that when "a habeas petitioner has been designated an enemy combatant and it is undisputed that he was captured in a zone of active combat operations abroad, further judicial inquiry is unwarranted when the government has responded to the petition by setting forth factual assertions which would establish a legally valid basis for the petitioner's detention." *Id.* That is, if the petitioner does not dispute that he was captured in a zone of active combat operations abroad and the government adequately alleges that he was an unlawful combatant, the petitioner has no right to present facts in connection with his habeas petition. Rather, his petition fails as a matter of law.

Because Hamdi did not dispute that he was captured "in Afghanistan during a time of active military hostilities," *id.* at 460, and the government set forth factual assertions establishing a valid basis for Hamdi's detention, the Fourth Circuit concluded that Hamdi was lawfully detained, *id.* at 476. In reaching that conclusion, the Court did not have to decide what standard to apply if the petitioner were to deny that he was captured in a zone of active combat operations abroad. *Id.* at 474 ("It is not necessary for us to decide

whether the 'some evidence' standard is the correct one to be applied in this case . . . .").

The Court in *Hamdi* took pains to point out that its holding was limited to "the specific context before us—that of the undisputed detention of a citizen during a combat operation undertaken in a foreign country and a determination by the executive that the citizen was allied with enemy forces." *Hamdi*, 316 F.3d at 465. That wise restraint is well worth following in this case by recognizing explicitly the limits of the current holding, and thereby recognizing as well the contrast between this case and *Hamdi*. Unlike Hamdi, Padilla was detained in this country, and initially by law enforcement officers pursuant to a material witness warrant. He was not captured on a foreign battlefield by soldiers in combat. The prospect of courts second-guessing battlefield decisions, which they have resolutely refused to do, *e.g., id.* at 474; *cf. Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), does not loom in this case.

The limits of this case warrant mention for another reason as well. The Jacoby Declaration is none too subtle in cautioning this court against going too far in the protection of this detainee's rights, suggesting at one point that permitting Padilla to consult with a lawyer "risks that plans for future attacks will go undetected." (Jacoby Decl. at 9) More than a match for that are passages in the *amicus curiae* submissions in this case, where lawyers raise the specter of *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), and call Padilla's detention "a repudiation of the Magna Carta", Supplemental Br. of Amici Curiae N.Y. State Ass'n of Criminal Defense Lawyers at 8, 25, thereby suggesting that if Padilla does not receive the full panoply of protections afforded defendants in criminal cases, a dictatorship will be upon us, the tanks will have rolled. Those to whom images of catastrophe come that easily might take comfort in recalling that it is a year and a half since September 11, 2001, and Padilla's is not only the first, but also the only case of its kind. There is every reason not only to hope, but also to expect that this case will be just another of the isolated cases, like *Quirin*, that deal with isolated events and have limited application.

Once again, counsel will consult in an effort to agree on the conditions under which Padilla will consult with counsel and, if he chooses, submit facts in response to the Mobbs Declaration. Absent agreement, the court will impose conditions. Lest any confusion remain, this is not a suggestion or a request that Padilla be permitted to consult with counsel, and it is certainly not an invitation to conduct a further "dialogue" about whether he will be permitted to do so. It is a ruling—a determination—that he will be permitted to do so.

The parties will attend a conference at 9:15 a.m. on March 27, 2003, in Room 21B, United States Courthouse, 500 Pearl Street, New York, NY, for the purpose of reporting on their consultations. Any party wishing to apprise the court in writing of any issues remaining after such consultations will do so by 5 p.m. on March 25, 2003.

SO ORDERED.