**In the Matter of the GRAND JURY SUBPOENA OF Jean FORD, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 938, Docket 85–6019.**

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1985.

Decided Feb. 25, 1985.

Peter J. Avenia, New York City (Mark B. Gombiner, and Gombiner & Avenia, New York City, on the brief), for appellant Jean Ford.

John F. Savarese, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., and Stuart E. Abrams, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before FEINBERG, Chief Judge, TIMBERS and CARDAMONE, Circuit Judges.

TIMBERS, Circuit Judge:

The essential question presented on this appeal—one of first impression in this Circuit—is whether the district court correctly held in civil contempt a grand jury witness who, relying on a claim of privilege against adverse spousal testimony, refused to testify where his wife was a target of the grand jury investigation, despite assurances by the government, which the district court found were sufficient, that the witness' testimony would not be used, directly or indirectly, against his wife. We hold

that the district court correctly held the witness in contempt.

Appellant Ford appeals from an order entered January 28, 1985 in the Southern District of New York, Robert W. Sweet, *District Judge,* holding appellant in civil contempt for his refusal to appear and testify before a grand jury. Appellant had refused to testify because of his claim of privilege against adverse spousal testimony, since his wife, Colette Pean, is a target of the grand jury investigation. The district court held that the government's promise not to use any of appellant's testimony, either directly or indirectly, against his wife, coupled with a screening procedure designed to insulate anyone involved in the investigation or prosecution of Colette Pean from his testimony, or the fruits thereof, was legally sufficient to meet the claim of privilege. We affirm.[1]

## I.

On November 13, 1984 appellant was subpoenaed to testify before a Special Grand Jury sitting in the Southern District of New York. On October 29, 1984 the grand jury had returned an indictment against eight individuals, including appellant's wife, Colette Pean, charging them with conspiracy to commit armed robberies of armored trucks and banks, in violation of 18 U.S.C. § 1951 (1982). *United States v. Chimurenga, et al.,* 84 Cr. 818 (RLC). The government sought appellant's testimony as part of its continuing investigation into these alleged conspiracies, intending to obtain a superseding indictment. On December 20, 1984 appellant filed a motion in the district court to quash the subpoena, claiming the privilege against adverse spousal testimony. The motion came on before Charles S. Haight, Jr., *District Judge.* In response to the motion, and in an effort to meet the claim of privilege,[2]

the government filed an affidavit of Assistant United States Attorney Kenneth Roth, the principal prosecutor in charge of the grand jury investigation, setting forth a procedure to insulate Colette Pean from any inculpatory effect of her husband's testimony.

Essentially, the Roth affidavit stated the government's promise not to use any of appellant's testimony, either directly or indirectly, in the investigation or prosecution of Colette Pean. In order to guarantee its promise, the government proposed the erection of a so-called "Chinese Wall". Pursuant to this procedure, appellant would be questioned by an AUSA other than Roth and before a grand jury other than the one conducting the principal investigation. That AUSA then would confer with others not connected with the principal investigation to determine if appellant's testimony was of sufficient value, in the view of the government, with regard to Pean's alleged co-conspirators to warrant using it. If the government determined that it was of such value, then Pean's trial under the October 29 indictment would be severed from that of her alleged co-conspirators and would be conducted by an AUSA who had had no contact with appellant's testimony or its fruits. Any superseding indictment which might be returned against Pean would be the product of an independent grand jury assisted by an AUSA who had had no contact with the prior grand jury proceedings. If appellant's testimony were found to be of insufficient value to warrant a separate prosecution of Pean, then no further use would be made of it and no person connected with the principal investigation would have contact with appellant's testimony or its fruits.

In a memorandum opinion filed January 9, 1985, Judge Haight held that the pro-

---

**1.** On February 25, 1985 we entered an order affirming the contempt order and stating that "A written opinion will follow shortly." This is that opinion.

**2.** The government argued initially that the privilege was inapplicable since appellant and his wife are separated or because they were joint

participants in a criminal conspiracy. In view of the procedure set forth in the Roth affidavit with respect to the privilege, neither of these arguments was seriously pressed in the district court. They have not been raised on appeal and we do not consider them.

posed procedure set forth in the Roth affidavit was sufficient to insure that no grand jury testimony elicited from appellant would be used, either directly or indirectly, against appellant's wife. Accordingly, the court ordered appellant to comply with the subpoena. The court also denied Colette Pean's motion to intervene in appellant's motion to quash the subpoena, since under the Supreme Court's decision in *Trammel v. United States*, 445 U.S. 40 (1980), only the witness-spouse has standing to raise the privilege.

On January 18, 1985 appellant and Pean moved in the district court for a stay of the order pending appeal. That motion was denied on January 21 on the ground that an order denying a motion to quash a subpoena does not become final, and hence appealable, unless and until a contempt citation is issued.

Pursuant to the procedure set forth in the Roth affidavit, and approved by the district court on January 9, appellant appeared on January 24, 1985 before a grand jury other than the one conducting the principal investigation. He persisted in his refusal to testify. He based his refusal on his claimed privilege against adverse spousal testimony and his assertion that the immunity order issued pursuant to 18 U.S.C. §§ 6002–03 (1982), conferring use immunity on "*John* Ford" (he being *Jean* Ford), was insufficient to grant him immunity. As a result of the name discrepancy in the immunity order, AUSA Savarese, who was assigned to question appellant, left the grand jury room twice to speak on the phone with AUSA Roth. Both later stated under oath that they did not discuss appellant's testimony.

On January 24, appellant appeared before Judge Sweet who was sitting in Part I. The government moved for an order directing appellant to testify. Judge Sweet reserved decision until January 28. By that time appellant had renewed his motion to quash on the ground that the conversations between AUSA Roth and AUSA Savarese were incompatible with the Chinese Wall procedure set forth in the Roth affidavit. On January 28, appellant was served with a revised immunity order directed to "*Jean* Ford". On the same day, Judge Sweet held that the conversations between Roth and Savarese did not breach the Chinese Wall agreement since they did not involve appellant's testimony, appellant not having testified at all. Judge Sweet denied the motion to reconsider the motion to quash and ordered appellant to testify. Appellant stated that he would continue in his refusal to testify, despite the order directing him to testify. Judge Sweet thereupon held appellant in civil contempt pursuant to 28 U.S.C. § 1826(a) (1982). He ordered appellant incarcerated until he complied with the court's order, or for the life of the grand jury or 18 months, whichever period was shorter. This expedited appeal followed. On January 30, 1985 a panel of this Court granted a stay of the contempt order pending appeal.

## II.

Rule 501 of the Federal Rules of Evidence in relevant part provides:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The two aspects of the marital privilege heretofore recognized by the federal courts are (a) the privilege protecting private marital communications and (b) the privilege against adverse spousal testimony. While the former is venerated,[3] the latter has been the subject of harsh, and often justifi-

---

3. The Supreme Court has described this privilege as "the best solace of human existence." *Trammel, supra,* 445 U.S. at 51 (citing *Stein v. Bowman,* 13 Pet. 209, 223 (1839)). *See also Wolfle v. United States,* 291 U.S. 7, 14 (1934).

able, criticism.[4] Professor Wigmore has described the latter privilege as "the merest anachronism in legal history and an indefensible obstruction to truth in practice." 8 Wigmore, Evidence § 2228, at 221 (McNaughton rev. 1961). In *Trammel, supra*, the Supreme Court had occasion to take another look at the privilege against adverse spousal testimony.[5] The Court there stated:

> "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public ... has a right to every man's evidence.' *United States v. Bryan*, 339 U.S. 323, 331 (1950). As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)."

445 U.S. at 50. Although the Court did not abrogate the privilege entirely, it did limit its application by holding that the privilege could be invoked only by the witness-spouse. It is not necessary for us to address the issue as to the continued vitality of the privilege against adverse spousal testimony, since both parties agree that the privilege is applicable in this case.[6]

The question before us is whether the procedure proposed by the government is sufficient to meet the claim of privilege against adverse spousal testimony. Although we have never addressed the issue of what protective procedure might be sufficient to meet that claim of privilege, the question has arisen in at least three other circuits in recent years. *In re Grand Jury Matter*, 673 F.2d 688 (3 Cir.), *cert. denied*, 459 U.S. 1015 (1982); *In re Grand Jury Proceedings (Hermann)*, 664 F.2d 423 (5 Cir.1981), *cert. denied*, 455 U.S. 1000 (1982); *In re Snoonian*, 502 F.2d 110 (1 Cir.1974).

In *Snoonian*, the First Circuit, recognizing that the marital privilege has never been construed as absolute, held that the government's affidavit stating that the non-witness spouse was not a target of the grand jury's investigation, coupled with the government's unequivocal and convincing promise not to use any of the witness-spouse's testimony, or its fruits, against the other, adequately met the claim of privilege. 502 F.2d at 112–13. Although in the instant case appellant's spouse is a target of the grand jury investigation, the government has promised the same "use-fruits" immunity which the court in *Snoonian* held was the more tangible assurance that the marital privilege would be protected. *Id.* at 112. *See also In re Grand Jury Proceedings (Hermann), supra*, 664 F.2d at 430–31.

The Third Circuit also has tacitly accepted such "use-fruits" immunity as sufficiently protective of the privilege. *In re Grand Jury Matter, supra.* There the court held that the witness-spouse was entitled to assert the privilege primarily because the government had withdrawn its initial promise of "use-fruits" immunity and had substituted a lesser guarantee that the non-witness spouse would not be indicted before the same grand jury hearing the witness-spouse's testimony. As the court stated, "the government, despite its representations to the contrary, hopes to use [the wife's] testimony in order to get to the husband." 673 F.2d at 692 n. 10. *See also United States v. George*, 444 F.2d 310, 314 (6 Cir.1971). In the instant case the government's sole purpose in seeking appellant's testimony is to obtain further evidence to support a superseding indictment

---

4. *Trammel, supra*, 445 U.S. at 43–46.

5. The Court had considered the privilege in *Hawkins v. United States*, 358 U.S. 74 (1958), but refused to reject or modify the privilege against adverse spousal testimony.

6. In a case where the issues were significantly different from those in the instant case, we

recently held that the privilege against adverse spousal testimony is not subject to a joint participant exception. *In Re: Grand Jury Subpoena, United States of America v. Hana Koecher*, No. 85–1033, slip op. 2257 (2 Cir. February 28, 1985).

against Pean's *alleged co-conspirators.* Furthermore, should the government ever attempt to use appellant's testimony, or the fruits thereof, against Pean, in contravention of its promise not to do so, "it is hard to conceive of a court failing to find an estoppel." *Snoonian, supra,* 502 F.2d at 112.

■ We hold that the government's promise not to use any of the witness-spouse's testimony before the grand jury, either directly or indirectly, against the non-witness spouse, is sufficient to meet the claim of privilege by the testifying spouse.

### III.

We turn next to various claims asserted by appellant.

■ Despite the government's promise, appellant argues that the proposed Chinese Wall procedure is "unrealistic, unworkable and insufficiently protective of the marital privilege." In support of this claim, appellant attempts to analogize the instant situation to conflict of interest situations involving law firms. We are not persuaded. We have held that lawyer disqualification in the case of a law firm should be ordered where a conflict undermines the court's confidence in the vigor of the attorney's representation of his client or where the attorney is in a position to use privileged information concerning the other side through prior representation. *Board of Ed. of N.Y. City v. Nyquist,* 590 F.2d 1241, 1246 (2 Cir.1979). In such cases, the policy behind the disqualification is the lawyer's duty of loyalty to his *client.* Courts are more likely to construe disqualification guidelines strictly in such situations since a private party always may retain another law firm. Such policy considerations do not apply to the United States Attorney's Office, since its attorneys represent only one "client". Furthermore, if the disqualification of one government attorney could serve as the predicate for the disqualification of the entire United States Attorney's Office, the administration of justice would be irreparably damaged. Indeed, federal regulations expressly provide for the substitution of another AUSA where an AUSA originally assigned to a case for some reason must recuse himself. 28 C.F.R. § 0.131 (1984). We also have recognized the propriety of screening procedures that insulate a former government attorney from particular matters being handled by the law firm which employs him where the former government attorney must disqualify himself. *Armstrong v. McAlpin,* 625 F.2d 433, 442–46 (2 Cir.1980) (en banc), *vacated on other grounds,* 449 U.S. 1106 (1981). Appellant has speculated on the various problems which may arise from the Chinese Wall proposed here. He cites as examples the two phone conversations between AUSA Roth and AUSA Savarese. We agree with the district court that these two conversations did not breach the Chinese Wall, absent proof that appellant's testimony was discussed. Furthermore, while possibilities for abuse do exist, we emphasize that it will be the government's burden to show that any investigation or prosecution of Pean has not been tainted by the testimony of appellant. *Cf. Kastigar v. United States,* 406 U.S. 441, 461 (1972); *United States v. Seregos,* 655 F.2d 33, 37 (2 Cir.1981), *cert. denied,* 455 U.S. 940 (1982).

■ Appellant also argues that the immunity granted by the government to Pean in this case is invalid since, unlike grants of immunity where claims of self-incrimination are involved, Congress has not provided any statutory authority for grants of immunity in marital privilege cases. Although appellant claims that the decision to grant immunity in these cases should be a matter of Congressional prerogative, he fails to establish that courts are without authority to sanction an executive decision to grant immunity in cases dealing with common law privileges. *In re Corrugated Containers Antitrust Litigation,* 644 F.2d 70 (2 Cir.1981), relied upon by appellant, merely stands for the proposition that, where Congress has authorized a grant of immunity, *e.g.,* 18 U.S.C. §§ 6002–03 (1982), the actual immunity conferred by a court

must be consistent with the legislative design. *In re Corrugated Containers, supra*, 644 F.2d at 78 n. 13. That Congress has not acted in the area of marital privilege is not surprising, for at least two reasons. First, the marital privilege, unlike that against self-incrimination, is derived from the common law and has no equivalent Constitutional stature. Second, as pointed out above, Rule 501 of the Federal Rules of Evidence provides that the privilege of a witness shall be governed by principles of common law as "interpreted by the courts ... in the light of reason and experience." The Supreme Court in *Trammel, supra,* recognized that rules of privilege must be developed on a case-by-case basis. 445 U.S. at 47. In view of this policy, and the Court's determination that the marital privilege must be balanced against the search for the truth, *id.* at 50, it is hardly incumbent on us to abstain from approving a procedure which adequately respects these competing goals merely because there is no express statutory authority for such procedure.

## IV.

Finally, Colette Pean seeks to appeal from that part of the order of the district court which denied her motion to intervene in the motion to quash the subpoena served on appellant. She argues that, where the witness-spouse invokes the privilege and the government attacks his exercise of it, the non-witness spouse must be allowed to intervene. This argument is without merit in view of the Supreme Court's square holding in *Trammel* that *only* the witness-spouse has standing to assert the marital privilege. 445 U.S. at 53.

To summarize: Since we find that the "use-fruits" immunity granted by the government to Colette Pean is fully co-extensive with the scope of the privilege against adverse spousal testimony, and that the screening procedure proposed by the government is both appropriate and workable, the order of the district court is affirmed. The stay previously entered by

a panel of this Court is dissolved. The mandate shall issue forthwith.

Affirmed.