**E-FILED**
**CNMI SUPREME COURT**
E-filed: Aug 22 2025 05:00PM
Clerk Review: Aug 22 2025 05:00PM
Filing ID: 76913185
Case No.: 2024-SCC-0017-CRM
NoraV Borja





IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,**
*Plaintiff-Appellant,*

*v.*

**RALPH ANTHONY DLG. TORRES,**
*Defendant-Appellee.*

**Supreme Court No. 2024-SCC-0017-CRM**

---

**SLIP OPINION**

**Cite as: 2025 MP 5**

Decided August 22, 2025

———————

ASSOCIATE JUSTICE JOHN A. MANGLOÑA
JUSTICE PRO TEMPORE ROBERT J. TORRES, JR.
JUSTICE PRO TEMPORE SABRINA S. MCKENNA

———————

Superior Court Criminal Action No. 22-0050-CR
Judge Pro Tempore Arthur R. Barcinas, Presiding

———————

MANGLOÑA, J.:

¶ 1      The Commonwealth appeals a trial court determination disqualifying the entire Office of the Attorney General ("OAG") from prosecuting criminal charges against Appellee Ralph DLG. Torres ("Torres") because of a lack of screening between the prosecutors and other attorneys with privileged information about Torres and his legal defense. We REVERSE the trial court's determination disqualifying the entire OAG, but AFFIRM the disqualification of specific attorneys based on the record.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2      The detailed factual history of this case is set forth in the companion to this opinion, *Commonwealth v. Torres* ("*Torres II*"), 2025 MP 6. This appeal arises from a complex procedural history involving multiple motions, evidentiary hearings, and reconsideration proceedings spanning from 2022 to 2024. Understanding this sequence is essential to evaluating the trial court's disqualification order and the Commonwealth's arguments on appeal.

¶ 3      In 2022, then-Governor Torres was charged with multiple counts of misconduct in public office, theft, and contempt—all relating to or stemming from allegations of improper public expenditure on airline tickets. Appendix at 678–82.

¶ 4      Torres moved to disqualify the entire OAG, and the court held an evidentiary hearing in May and June 2022. After hearing testimony and receiving declarations from various government attorneys, the court determined that the attorney of record for the Commonwealth, Chief Solicitor J. Robert Glass, Jr. ("Glass"), had been exposed to privileged information regarding the contempt charge and dismissed the one count without prejudice. The court further determined that the OAG screening procedures for the remaining counts were sufficient and denied the motion to disqualify further.

¶ 5      Special Prosecutor James R. Kingman ("Kingman") subsequently joined the OAG to represent the Commonwealth in 2023. Torres filed several motions aimed at removing Kingman from the prosecution, culminating in an April 2023 motion to reconsider the initial disqualification order filed in August 2022.

¶ 6      The court heard arguments in December 2023 and determined that the initial order was clearly erroneous in finding that Torres was not a client of the OAG, granting reconsideration of the decision to disqualify. It further found that the purported screening by the OAG was nonexistent, determining that the relationship described in Kingman's contract with the OAG was inconsistent with the OAG's screening procedures described in testimony from the 2022 hearing. The court found that the attorneys tainted by privileged information were not sufficiently screened from the case and vicariously disqualified the entire OAG. As a final matter, the court declined to appoint a special prosecutor to replace the OAG, leaving "it to the executive branch to take up the prosecutorial mantle if it so chooses." Appendix at 34. The Commonwealth timely appeals.

## II. JURISDICTION

¶ 7    We have jurisdiction over final orders and judgments of the Superior Court. NMI CONST. art. IV, § 3. When a non-final order is appealed without a constitutional or statutory basis for appeal, we may still consider the appeal through the common law collateral order doctrine. To satisfy the doctrine, the order must conclusively determine a disputed question, resolve an important issue separate from the merits of the complaint, and be effectively unreviewable on appeal from a final judgment. *Reyes v. Commonwealth*, 2024 MP 8 ¶ 5.

¶ 8    Federal circuit courts have consistently found that disqualification of an entire prosecutorial office satisfies all three elements of the collateral order doctrine. In *United States v. Bolden*, the Tenth Circuit found that it had jurisdiction to hear the appeal of an order disqualifying the whole United States Attorney's Office and appointing an Assistant United States Attorney from another district. 353 F.3d 870 (10th Cir. 2003). The court determined that the Constitution granted the Executive the power to "take care that the laws are faithfully executed," US CONST. art. II, § 3, the alleged injury "is grounded in separation of powers," and could not be vindicated on final appeal. *Bolden*, 353 F.3d at 877. The court distinguished *Flanagan v. United States*, 465 U.S. 259 (1984), where the Supreme Court held that a criminal defendant could not immediately appeal a pretrial order disqualifying their attorney, because "appellate vindication [and reinstatement of the prosecutor] cannot undo such an invasion of Executive authority." *Id.* at 878.

¶ 9    Citing *Flanagan*, this Court held in 1993 that disqualification of the Attorney General's office from representing a defendant in a criminal case was not immediately appealable through the collateral order doctrine. *Commonwealth v. Guerrero*, 3 NMI 479 (1993). The Court held that the third element was not met because a new trial could be granted if—after a final judgment—the court determined that the disqualification was in error. *Id.* at 482. The disqualification of private civil attorneys has also been held to not satisfy the collateral order doctrine on similar grounds. *Olopai v. Hillblom*, 3 NMI 528 (1993).

¶ 10    The lower court based its reasoning in *Mattel, Inc. v. MGA Entertainment, Inc.*, 408 Fed. Appx. 45 (9th Cir. 2011), in which the Ninth Circuit determined that the collateral order doctrine was not satisfied to allow the appeal of a disqualification order. In *Mattel*, private counsel was vicariously disqualified after an attorney previously representing one party was hired by the opposing counsel. *Id.* at 46. Like in *Flanagan*, *Guerrero*, and *Olopai*, the *Mattel* attorney disqualification did not involve any constitutional powers.

¶ 11    Prosecutorial offices are distinct from other attorneys because of their innate executive power. Decisions on the appealability of disqualification orders for private or defense counsel are unpersuasive on the question of disqualifying an entire prosecutorial office; those types of attorney disqualifications do not mirror the same scope of considerations involved in the type of disqualification here. This is especially true in the Commonwealth, where the OAG has a *constitutional* duty to prosecute violations of the law. *Compare* NMI CONST. art.

III, § 11 *with* 28 U.S.C. § 547 (empowering United States Attorneys to prosecute offenses by statute). Hence, we adopt the rationale of the various federal circuit courts and find that the disqualification of the entire OAG from prosecuting a criminal case satisfies the three elements of the collateral order doctrine.

¶ 12    First, the order determined that the OAG could not continue with any prosecution of Torres. The "effect of any attorney disqualification is fairly irreversible because it materially changes the party's position." *United States v. Williams*, 68 F.4th 564, 570 (9th Cir. 2023) (quoting *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1357 (9th Cir. 1981) (internal quotations removed). The court made the determination that the OAG in its entirety was vicariously disqualified in two separate cases. *See Commonwealth v. Torres,* 2025 MP 6.

¶ 13    Second, it resolves an important question separate from the merits. *Reyes*, 2024 MP 8 ¶ 5. The order did not decide Torres's guilt or innocence for any of the charges, but did decide an issue of high importance to the general public. *Williams*, 68 F.4th at 570. Immediate appellate review is warranted when separation of powers is implicated by the disqualification order. *Id*; *Bolden*, 353 F.3d at 876.

¶ 14    Lastly, the disqualification would be effectively unreviewable after a final judgment. An issue is effectively unreviewable on appeal only if it involves an asserted right that would be lost if not vindicated before trial. *Reyes*, 2024 MP 8 ¶ 5. This Court, and most other jurisdictions, have generally interpreted few rights as satisfying this element—losses of liberty, like bail orders and transfers from juvenile to adult courts are immediately appealable, but denials of sovereign immunity and rights to be free from litigation are not. *In re JJC*, 2000 MP 8; *CDA v. Camacho*, 2010 MP 19; *id*; *Takasi v. Yoshizawa*, 2022 MP 1; *Island Star Int'l v. Yu*, 2025 MP 2 ¶ 11.

¶ 15    Potential harm to the separation of powers cannot be remedied after a final judgment—in this case, a determination of guilt or innocence. *Williams*, 68 F.4th at 570. Under any possible outcome from a final judgment, the Commonwealth would be unable to vindicate its right to prosecute these charges. Double jeopardy would prevent further prosecution if Torres prevailed and statutory limitations on the right to appeal a guilty verdict would limit the Commonwealth's ability to raise this issue if it prevailed. *Id.*; *see* 6 CMC § 8101. We may assert jurisdiction over this appeal under the collateral order doctrine and must also address the Commonwealth's ability to bring an interlocutory appeal.

¶ 16    The Commonwealth Criminal Code only allows the Commonwealth to appeal a criminal case under narrow circumstances. Relevant to this appeal, it only has the right to appeal "when a written enactment intended to have the force and effect of law has been held invalid" or when "a decision, judgment, or order of the Superior Court dismiss[es] an information or grant[s] a new trial after verdict or judgment, as to any one or more counts." 6 CMC § 8101(a)–(b).

¶ 17    The Commonwealth argues that the appealed order invalidates Article III, Section 11 of the Commonwealth Constitution and 1 CMC § 2154. The order holds neither invalid. The lower court's decisions would not prevent the Attorney General from prosecuting violations of the law except in narrow circumstances, as deemed necessary to comply with the court's interpretation of the Rules of Professional Conduct, nor would they prevent the *employment* of staff in the OAG—only limit their participation in conflicted matters.

¶ 18    However, to find that this order is unappealable would be a disservice of justice. Federal courts have allowed similar appeals by government attorneys under the collateral order doctrine, without requiring a statutory basis for the right to appeal. *United States v. Caggiano*, 660 F.2d 184, 189 (6th Cir. 1981). By finding that the collateral order doctrine allows this appeal, we decide the appealed order is equivalent to a final order. *Caggiano* allowed the government to appeal a disqualification of the United States Attorney's Office under 28 U.S.C. § 1291, as if the order was a final decision from the lower court, rather than 18 U.S.C. § 3731, which allowed interlocutory appeals in criminal cases. *Id.* Section 3731 is similar to 6 CMC § 8101 because it creates nearly identical limitations on the prosecutor to bring appeals of nonfinal judgments, and our own constitutional jurisdiction over appeals is mostly coextensive with that created by 28 U.S.C. § 1291.

¶ 19    "It is true that certain orders relating to a criminal case may be found to possess sufficient independence from the main course of prosecution to warrant treatment as plenary orders, and thus be appealable on the authority of 28 U.S.C. § 1291 without regard to the limitations of 18 U.S.C. § 3731." *Id*. at 189 (quoting *Carroll v. United States*, 354 U.S. 394, 403 (1957)). This matter certainly presents such a scenario, predicated upon our finding that the collateral order doctrine is satisfied. *Supra* at ¶ 15. Section 8101(b) of the Commonwealth Code permits appeals of plenary or near-plenary orders adverse to the prosecution's case—namely orders of dismissal and for new trials. 6 CMC § 8101(b). To allow this appeal is not far removed from the statutory provisions and does not offend our common law construction of appellate jurisdiction.

¶ 20    The Commonwealth may bring an appeal under the collateral order doctrine as if the order is final and subject to our constitutional jurisdiction, without need to appeal under any section of 6 CMC § 8101. As this Court finds that the disqualification order is appealable, it is unnecessary to address the Commonwealth's petition for a writ of mandamus. Having established jurisdiction, we now examine the substantive issues raised on appeal.

### III. STANDARDS OF REVIEW

¶ 21    Numerous interconnected issues are presented on appeal. First, we review the court's decision to hear the motion for reconsideration de novo as a question of law. *Commonwealth v. Eguia*, 2008 MP 17 ¶ 4. Second, whether Torres has been charged in his official capacity as the governor is also reviewed de novo. *Id.*

¶ 22    Finally, disqualifications of individual attorneys are reviewed for abuse of discretion. *Commonwealth v. Oden*, 3 NMI 186, 191 (1992). "An abuse of discretion exists if the court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Commonwealth v. Campbell*, 4 NMI 11 (1993). The Court thus reviews the disqualification of the entire office of attorneys, including the procedure employed by the court, for abuse of discretion. *Williams*, 68 F.4th at 571.

## IV. DISCUSSION
### A. Timeliness of the motion for reconsideration

¶ 23    We begin our discussion with the timeliness of the motion for reconsideration filed around seven months after the court's initial order was entered. Motions for reconsideration in criminal cases are judicial constructions, not proscribed by any court rules. *United States v. Healy*, 376 U.S 75, 79–80 (1964). In allowing these motions, however, we have specified that they should be approved using the same standard as in civil cases: when there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Eguia*, 2008 MP 17 ¶ 7 (quoting *Camacho v. J.C. Tenorio Enterprises, Inc.*, 2 NMI 408, 414 (1992)). No deadline for filing a reconsideration motion in criminal cases has been identified to date.

¶ 24    In granting the motion, the lower court used NMI Rule of Civil Procedure 54(b) to determine that the initial order "may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." The court reasoned that using this Rule was appropriate because the order being reconsidered was interlocutory and the standard was "similar to those for a motion for reconsideration" under Civil Procedure Rule 59(e), which applies to motions filed after an entry of judgment. Appendix at 21.

¶ 25    The Commonwealth alleges that the court specifically erred in applying the Rules of Civil Procedure to a criminal case, and more generally in taking up a motion filed so long after the initial order was entered. Appellant's Br. at 12–14. We consider this issue of law de novo for the first time. *Eguia*, 2008 MP 17 ¶ 4.

¶ 26    Delays in criminal prosecutions are harmful to the right to a speedy trial generally and to the public's interest in a resolution to the question of misconduct by an elected official. *Commonwealth v. Superior Court* (*Ada*), 2004 MP 14 ¶ 13. It is in the best interest of justice to limit the time in which parties can move for reconsideration and delay forward progress in criminal cases.

¶ 27    The Rules of Civil Procedure are not applicable to criminal prosecutions, and it is erroneous to apply them outright, but courts may look to civil rules to create necessary procedures under the common law. *See Eguia*, 2008 MP 17 ¶ 7; *see also United States v. Warren*, 22 F.4th 917, 922 (10th Cir. 2022). The creation of procedures governing motions for reconsideration is necessary to allow courts to exercise their authority to actually reconsider non-plenary orders in criminal

proceedings. *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (citing *Healy*, 376 U.S at 77–80).

¶ 28    Without a guiding statute or rule for this issue, we determine that the proper deadline to file a motion for reconsideration during a criminal prosecution is generally 30 days. This time requirement is consistent with the deadline for filing a notice of appeal under Supreme Court Rule 4(b). *See also Healy*, 376 U.S. at 78 (allowing a petition for rehearing to be filed within the 30-day appeal window). Many federal jurisdictions also use the equivalent appellate window for this purpose. *See, e.g.*, *Warren*, 22 F.4th at 927. Some states also require criminal motions for reconsideration be filed on a similar timeline. *See, e.g., State v. Franson*, 921 N.W.2d 783, 785 n.1 (Minn. App. 2018) (permitting the trial court to "entertain such a motion before the state's time for appeal has expired"); LA. CODE CRIM. PROC. ANN. art. 881.1 (requiring motions to reconsider a felony sentence be filed within 30 days unless a longer period is allowed by the trial court).

¶ 29    While courts have generally "approved of the judicial economy that results from the pretrial reconsideration" of trial court orders, explicit deadlines for judicially constructed reconsideration procedures outside the federal system are rare. *United States v. Rabb*, 752 F.2d 1320, 1322 (9th Cir. 1984), *abrogated in part on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987). Most state courts that permit motions for reconsideration leave broad procedural discretion to the trial courts and do impose special limitations beyond the inherent limitation that reconsideration must occur before final judgment or close of trial and meet a high standard to be granted.. *See State v. Villegas*, 506 S.W.3d 717, 767 (Tex. App. 2016). Cognizant of the fact that creating a deadline for a pretrial motion for reconsideration puts the Commonwealth in the minority of jurisdictions for this issue, we do so with a caveat.

¶ 30    Future motions for reconsideration may be properly considered if filed within 30 days of the initial order or with a showing of good cause for any untimely filing. A good cause determination for a motion brought after more than 30 days is within the discretion of the trial court. *See Healy*, 376 U.S. at 79–80; *see also State v. Hagberg*, 220 P.3d 47, 50 (Or. 2009) (recognizing a rule allowing court to waive a motion for reconsideration deadline for "good cause"). Such a motion, if considered after the initial 30 days, must still meet a high standard to be granted. Interlocutory motions for reconsideration may only be approved in criminal cases because of "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Eguia*, 2008 MP 17 ¶ 7 (quoting *Camacho*, 2 NMI at 414). A non-rigid deadline for these motions balances the interests of the parties in a criminal prosecution with the reality of finite judicial resources and the ultimate interest of justice. As noted by the Supreme Court,

> "Of course, speedy disposition of criminal cases is desirable, but to deprive the [trial court] of the opportunity. . . for the correction of errors might, in some circumstances, actually prolong the process

of litigation—since plenary consideration of a question of law here ordinarily consumes more time than disposition of a petition for rehearing—and could, in some cases, impose an added and unnecessary burden of adjudication upon this Court."
*Healy*, 376 U.S. at 80.

¶ 31　Even though Torres brought this motion well beyond 30 days after the initial order was filed, there was good cause shown for the delay in filing. Torres raised in the motion that "the wall or screen purportedly erected by the OAG is nonexistent," predicated on new evidence. Appendix at 20, 27. Such new evidence was related to the engagement of Kingman as a Special Prosecutor for the OAG. *Id.* at 27. Kingman was admitted pro hac vice for this Superior Court case, pursuant to the terms of his contract, on March 6, 2023. *Id.* at 683; *In re Kingman*, 2023 MP 6 ¶ 3. This motion was then filed on April 6, 2023—31 days later. The pro hac vice admission, as a public record, provided new evidence relevant to the initial order and the assumptions that the court made regarding the OAG screening procedures. Appendix at 51 ("The OAG has met the general standards for screening Glass as laid out in Model Rule 1.10 and is therefore presumed sufficiently screened.") Given that we now construct a flexible deadline for filing these interlocutory motions, the court made no error in considering the motion.

### B. Criminal charges brought against individuals in their personal capacity

¶ 32　Next, we address the trial court's determination regarding the capacity in which Torres was charged. The Commonwealth argues that the court clearly erred in determining that Torres was criminally charged in his official capacity as the former Governor. The initial order determined that the criminal charges in these cases were "leveled against an individual, even if the crime could only have been committed by an individual holding an office." *Id.* at 46. The court used this determination to find that the OAG did not have an attorney-client relationship with Torres, but only with the office of the governor. *Id.* at 48–49.

¶ 33　The disqualification order reversed this finding, stating it was a clear error to determine the charges were brought against Torres in his personal capacity. *Id.* at 26. The court summarily stated that 1 CMC § 7407(f) can be brought only against someone acting in their capacity as a government employee.

¶ 34　Section 7407(f), in relevant part, says "The Commonwealth Government shall not purchase . . . an airline ticket for travel in first class, business class, or any other premium class designation. . . . Any government employee who causes an airline ticket to be issued in violation of this section shall pay a civil fine of one-thousand dollars." This is the statute that Torres is alleged to have violated, leading to the misconduct in public office charges filed in 2022. A violation of section 7407(f) would also constitute a violation of 6 CMC § 3202(b)(1): "A person, being a public official, commits the offense of misconduct in public office if the person: does any illegal act under the color of office."

¶ 35    Interpreting the Commonwealth Code and our precedent to suggest that criminal charges are brought against individuals in their official capacities would be inconsistent with established precedent and statutory language. The statute Torres is accused of violating specifically states that the crime is committed by "a person" acting with the color of office. 6 CMC § 3202(b)(1). In *Commonwealth v. Atalig*, this Court further specified that the elements for Misconduct in Public Office which must be proven beyond a reasonable doubt are that the defendant is "1. A public official who does 2. any illegal act 3. under color of office." 2002 MP 20 ¶ 46. To state that the charges must be brought against an officer in their official capacity would negate the first element of the crime misconduct in public office.

¶ 36    This Court has examined the elements of this statute several times, with no indication that the various charges were all brought against the public officers in their official capacities. To do so now would complicate their holdings. In *Commonwealth v. Ogumoro*, the Court found that the statute of limitations for the misconduct charges began the day the defendant was fired as a police officer strictly because he could no longer act as a public official under color of office. 2020 MP 8 ¶ 40. *Ogumoro* cited *Commonwealth v. Kaipat*, which similarly held that police are public officials because of their ability to act under color of office. 2 NMI 322, 333 (1991). No opinion analyzing section 3202 has ever mentioned that the charges were brought against public officials because they were actually acting in their official capacity.

¶ 37    Unlike the scenario created by the lower court, civil suits—when brought against public officials in their official capacity—are widely treated as suits against the government, rather than the individual. Typically, the Commonwealth will step in for an employee sued for a tort committed while acting in their official capacity. *Reyes*, 2024 MP 8 ¶ 23. The Court has also stated that most other jurisdictions consider criminal actions to be outside the scope of employment. *Kabir v. CNMI PSS*, 2009 MP 19 ¶ 47.

¶ 38    Furthermore, to find that the charges were brought against Torres in his official capacity would mean that the charges are now irrelevant. In *Torres v. House Standing Committee on JGO*, this Court noted that a lawsuit initiated by former Governor Torres was mooted, in part, by his term ending. *See* 2023 MP 10 ¶ 11 (declaring an appeal moot because former Governor Torres was no longer in office and was not an appellant in his personal capacity).

¶ 39    The court erred in determining that the initial order committed clear error in finding that the criminal charges were brought against Torres in his personal capacity. Charges of violations of Commonwealth law, particularly misconduct in public office in violation of 6 CMC § 3202, are not brought against individuals in their official capacities. Since the court relied on this erroneous view of the law, the disqualification order must be reversed.

### C. Vicarious disqualification of the Office of the Attorney General

¶ 40   We now turn to the broad question of whether the entire Office of the Attorney General may be vicariously disqualified. The Commonwealth argues that the trial court erroneously applied a portion of the Model Rules of Professional Conduct to the OAG, which then caused the court to improperly impute a conflict of some attorneys on the entire office and vicariously disqualify the whole of the OAG from the prosecution. Opening Br. at 20–25. The Commonwealth then claims that the screen enacted by the OAG is sufficient for the misconduct in public office and theft charges brought in this case. *Id.* at 26.

¶ 41   The disqualification order declared that the entire OAG failed to screen two tainted attorneys, Attorney General Edward Manibusan and Glass, who possessed privileged information regarding the dismissed contempt charge. Appendix at 29. The court found that the Attorney General "effectively 'switched sides'" by bringing contempt charges after advising the Governor on responding to the subpoena that led to Torres being held in contempt by the Legislature. *Id.* Though that charge has been dismissed from this case, the court still determined that it "springs from and is inherently tied to the charges in this case," creating an irrebuttable presumption that Manibusan and Glass's conflict is imputed to the office at large. *Id.* at 29–30 (citing *Mattel*, 408 Fed.Appx. at 46).

¶ 42   Model Rule of Professional Conduct 1.10 imputes the conflict of one attorney in a firm onto all others in the firm so that "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so." ABA MODEL RULES OF PROF'L CONDUCT R. 1.10(a) (hereinafter "MRPC"). Two exceptions to this rule permit proper screening procedures to allow the conflicted representation to continue if it is a personal conflict of interest or based upon the disqualified attorney's association with a prior firm. *Id.*

¶ 43   Model Rule 1.10 only applies to this case if there are attorneys prohibited from representing a client, working in a firm where that conflict could be imputed to other attorneys. Manibusan stated in the 2022 evidentiary hearing that he is screened from participation in this prosecution because of a conflict. Appendix at 241. In *Torres II*, we determine that Kingman and Glass are both disqualified from prosecuting the charges against Torres because of the cumulative appearance of impropriety and insufficient screening procedure. 2025 MP 6 ¶¶ 20, 25–26.

¶ 44   The Commonwealth asks this Court to reverse the finding from the trial court that the bifurcated contempt and misconduct in public office charges are insufficiently distinct and are cross-contaminated. *See* Appendix at 30. While the disqualification of an attorney is based on a factual analysis of the conflict, we must also consider the preservation of public confidence in the bar and the legal process as a whole. *See Williams*, 68 F.4th at 573 (requiring "a strong factual predicate for blanket disqualification"); *but see McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983) (allowing disqualification where there is the possibility for an appearance of professional impropriety).

¶ 45   There is little discernible distinction between this case and *Torres II.* 2025 MP 6 ¶ 24. The initial charges were all filed in the same information, predicated on the same body of facts. Appendix at 678. Much of the relevant procedural history for the companion case is identical. The same parties are proceeding in both cases, with assistance from the same sets of attorneys. *Id.* These parallel cases are likely indistinguishable in the public eye.

¶ 46   Public confidence in the legal system may be eroded when attorneys with known conflicts and who have been publicly disqualified continue to participate in related prosecutions. This is particularly true for the OAG as the representatives of the Commonwealth, prosecuting charges that this Court has identified of special interest to the public. *Manibusan*, 2018 MP 4 ¶ 27; *Ada*, 2004 MP 14 ¶ 13. We cannot say it was clear error for the trial court to consider the two parallel prosecutions of Torres to be "inherently tied" together. Appendix at 30. We uphold the disqualifications of individual attorneys Glass and Kingman, as announced in *Torres II*, 2025 MP 6 ¶¶ 20, 25-26.

¶ 47   Given that attorneys in the OAG have a conflict with this prosecution, Model Rule 1.10 will apply only if this conflict can be imputed to the other attorneys employed in the office as if they are "associated in a firm." MRPC 1.10(a). The Commonwealth argues that Model Rule 1.10 does not apply to the OAG at all, because it is not a firm.

¶ 48   This issue has not been addressed by this Court, though we have stated that the Model Rules generally apply to the OAG. *Torres v. Manibusan*, 2018 MP 4 ¶ 23 n.5. In his 2022 testimony, Manibusan also stated that he believed the Model Rules in its entirety apply to the Attorney General. Appendix at 275. The Model Rules themselves define "firm" in Rule 1.1 and the comments of Rule 1.10 as "lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization." MRPC 1.10 cmt. 1. The Model Rules further clarify that, "[w]ith respect to the law department of an organization, including the government, there is ordinarily no question that the members of the department constitute a firm within the meaning of the Rules of Professional Conduct." MRPC R. 1.1 cmt. 3. Under a strict reading of the Model Rules, the OAG could be considered a firm for the purposes of conflict imputation under Model Rule 1.10.

¶ 49   However, the Model Rules should not be applied to the OAG in a rigid or mechanical manner. *See State v. Klattenhoff*, 801 P.2d 548, 603 (Haw. 1990)("[D]ue to the [attorney general]'s statutorily mandated role in our legal system, we cannot mechanically apply the Code of Professional Responsibility to the [attorney general]'s office."). Our analysis of this issue as it applies in the Commonwealth must leave room for the nuances of local law and the unique position that the OAG occupies in the Commonwealth government. Prosecutors and government attorneys are exempted by the Model Rules from other requirements that may be inconsistent with their duties. *See* MRPC Scope at ¶ 18

(recognizing that government attorneys have greater vested authority than private counsel and "may be authorized to represent several government agencies . . . in circumstances where a private lawyer could not represent multiple private clients"); MRPC R. 1.13 cmt. 9 (allowing a unique balancing test applicable only to government attorneys). Prosecutors are otherwise subject to additional responsibilities beyond those of other attorneys, including upholding the constitutional rights of defendants. MRPC R. 3.8.

¶ 50    The unique clients of the OAG also assuage concerns for protection of client rights and information applicable to private attorneys. The constitutionally mandated clients of the OAG are the Governor, executive departments, and the Commonwealth itself. NMI CONST. art. III, § 11. It is an uncommon scenario, such as presented in this appeal, where the clients of the OAG find themselves in adverse or conflicting positions. Additionally, Model Rule 1.10 only allows for an exception to the imputation of conflicts for work from a "prior firm"—not a prior or concurrent client government office while employed by the same "firm." MRPC 1.10(a).

¶ 51    Consistent with the Model Rules' special treatment of government attorneys to accommodate for their unique responsibilities and authorities, the imputation of one attorney's conflict to the entire OAG is not practical or in the interest of justice in the Commonwealth. The mechanical application of Model Rule 1.10 to the OAG would result in a scenario where the conflict of Manibusan, Glass, or Kingman would be automatically imputed to the entire OAG, without an opportunity for the OAG to implement screening procedures. Such application of the Rules would limit the ability of the OAG to serve its constitutionally mandated duty, without recourse. Public policy beyond the scope of the Model Rules requires that the conflicts in this case not be imputed to the entire OAG and the OAG be allowed to enact screening procedures for this conflict of interest.

¶ 52    Other jurisdictions allow screening procedures for attorneys exposed to privileged information regarding a prosecution being undertaken by their office. *Grand Jury Subpoena of Ford v. United States* concluded that disqualified attorneys could and should be screened off prosecutions and the entire office should not be disqualified from a prosecution. 756 F.2d 249, 254 (2d Cir. 1985). The court used various policy considerations to make this decision. First, the disqualification rule was designed to protect an attorney's clients, and United States Attorneys have only one real client—the government. *Id.* Next, federal regulations allow for Assistant United States Attorneys to substitute into a case when others recuse, and that case law has allowed former government attorneys to be screened out of their law firms. *Id.* Finally, the court stated that the defendant would not be without recourse to argue any impropriety, as "it will be the government's burden to show that any investigation or prosecution . . . has not been tainted" by the conflict of interest. *Id.*

¶ 53    "Before disqualifying an entire U.S. Attorney's Office, a district court must make specific factual findings that show that the office's continued

representation would result in a clear legal or ethical violation." *Williams*, 68 F.4th at 574. Federal circuits do not allow for broad disqualifications of entire prosecutorial offices only due to vicarious disqualification or imputations of conflicts on the entire office. Blanket disqualifications are considered extreme remedies "only appropriate in the most extraordinary circumstances" after the court has determined that the United State Attorney's Office's continued representation of the government would result in a legal or ethical violation. *Id.* at 573.

¶ 54    Guam has also recently held that the Office of the Attorney General may use screening procedure to contain one attorney's conflict of interest. In *In re Request of Lourdes A. Leon Guerrero*, the Guam Supreme Court stated that assistant attorneys general may continue a prosecution when another, uninvolved assistant attorney general has a conflict. 2024 Guam 18 ¶ 57. Only "in extraordinary circumstances—such as where a conflicted assistant attorney general remains unscreened and continues to participate in or discuss the matters where they have a conflict—is disqualification of the entire office necessary." *Id.* The Guam court concluded that, when the Attorney General has a conflict of interest due to having advised a government officer in their "official capacity on matters related to an offense with which the officer is charged," whether the conflict is imputed to entire office "should be decided case by case after considering the entire complex of facts surrounding the conflict." *Id.* ¶ 61.

¶ 55    *In re Request of Lourdes A. Leon Guerrero* relied upon state court decisions which applied Model Rule 1.10 in a flexible manner, forgoing rigid or mechanical application.  Indiana does not require disqualification of the entire prosecutor's office because of an uninvolved conflicted attorney, absent a showing from the defendant that they will be actually prejudiced by the prosecution. *Page v. State*, 689 N.E.2d 707, 709 (Ind. 1997). Washington allows chief prosecutors to delegate authority and be "scrupulously" screened off of prosecutions where they have privileged information where "the previous case is not the same case (or one closely interwoven therewith) that is being prosecuted, and where, for some other ethical reason, the prosecuting attorney may be totally disqualified from the case." *State v. Stenger*, 760 P.2d 357, 360 (Wash. 1988). Likewise, the Hawaiʻi Supreme Court recognizes the availability of screening measures for attorneys with conflicts within the attorney general's office. *See Wong v. Cayetano*, 143 P.3d 1, 19 (Haw. 2006) (implicitly approving screening measures between attorney general criminal division attorneys pursuing charges against trustee of charitable trust and civil division attorneys seeking removal of trustee in probate court). We recognize that there are states that take a contrary view, but they are in the minority and only adopt this position under extenuating circumstances. *See State ex rel. Keenan v. Hatcher*, 557 S.E.2d 361, 370 (2001) (Entire prosecutor's office disqualified where an attorney was previously the defendant's counsel and some of the charges were predicated on the prior conviction, "simply raise[ing] too great a danger that a client's confidences may be betrayed.").

¶ 56    There is no justification to disqualify the entire OAG here. There is no evidence that all attorneys associated with the OAG have been exposed to privileged information or other conflicts arising from the representation of the Governor and executive departments. *Williams*, 68 F.4th at 574. It is not apparent from the record that other, unnamed attorneys associated with the OAG are unscreened and have been included in discussions of the conflicted information. *In re Request*, 2024 Guam 18 ¶ 57.

¶ 57    Instead, the record reveals that Assistant Attorneys General in the OAG were screened and separated from the prosecution team. Attorney General Manibusan testified that all screening procedures outlined in the OAG's Policies and Procedures Manual were applied with substantial compliance for other attorneys in the OAG. Appendix at 38, 200. Glass was physically removed from the office housing attorneys providing representation to the executive branch, all prosecution files were separated from the regular filing system, and necessary employees of the OAG were provided notice of the screen. *Id.* at 38. Though we affirm Glass's disqualification from this prosecution, we find that this screening procedure prevents imputation of a conflict onto the entire office.[1] The trial court erred in imputing the conflict to the OAG and vicariously disqualifying the office without an explicit finding of fact that the entire office had been tainted.

*D. The OAG is required to provide notice of screening procedures to Torres.*

¶ 58    In its argument that screening procedures were sufficient, the Commonwealth argues that it provided all necessary notices regarding the screening procedure employed for this case in the OAG. *See* Opening Br. at 26 n.18. In light of our findings on disqualification, we clarify the OAG's obligations regarding notice of screening procedures to individuals with whom it has had a professional relationship transcending the traditional attorney-client relationship.

¶ 59    Attorneys may not represent a client if doing so creates a concurrent conflict of interest. The Model Rules of Professional Conduct explicitly prohibits attorneys from taking on a client where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal

---

[1]    If the entire Office of the Attorney General was disqualified from prosecuting a criminal case, the court may not prevent the Attorney General from appointing a new special prosecutor. The Constitution places the duty of prosecuting violations of the law solely with the Attorney General. NMI CONST. art. III, § 11. HLI 17-2, passed in 2012, significantly reduced the authority of the Governor over the Attorney General, notably removing appointment power from the Governor and converting the Attorney General into an elected office. *Manibusan*, 2018 MP 04 ¶ 18-19. Under the Constitution and Commonwealth Code, the Attorney General retains the power to appoint prosecutors. *See* 1 CMC 2154. Such appointments are administrative tasks that do not inherently breach any conflict screening wall. However, the Attorney General and other attorneys in the OAG must not be further associated with the prosecution beyond what initial administrative orientation is practically required.

interest of the lawyer." MRPC R. 1.7(a)(2). The exception to this is if, among other necessary criteria, the current client gives informed, written consent to the attorney undertaking the new representation. MRPC R. 1.7(b).

¶ 60     The trial court initially determined that Torres was never a client of the OAG. Appendix at 47. The reconsideration order then improperly reversed this finding, based on the premise that the charges were brought against Torres in his official capacity. *Id.* at 26; *supra* at ¶ 39. Torres, in his personal capacity—as he appears before this Court, has not been represented by the OAG.

¶ 61     It is indisputable under the Constitution that the Governor and the Commonwealth are both concurrent clients of the OAG. NMI CONST. art. III, § 11. As recognized in *Torres v. Manibusan*, however, this relationship is not a traditional attorney-client relationship. The Governor is limited "from interfering with the attorney general's power to prosecute cases" and the Attorney General has the power to decline to prosecute cases and appeals. *Id.* Furthermore, the Governor or any executive departments may not hire outside counsel to subvert the Attorney General's power and pursue an appeal that has been declined by the OAG. *Id*. Under this constitutional framework, the Governor—as the client— does not hold the power to choose his own counsel, a hallmark right for private clients. *Wheat v. United States*, 486 U.S. 153, 159 (1988).

¶ 62     The Model Rules of Professional Conduct recognize that a government attorney faces difficulty meshing the authority inherent in their position with the ideals of private attorney-client relationships enshrined in the Rules. MRPC Scope at ¶ 18. The Model Rules generally apply to the OAG, even if not every rule contained therein applies. *See, e.g., Commonwealth v. Lot 218-5 R/W*, 2013 MP 5 ¶ 11.

¶ 63     The OAG and Torres do not have an attorney-client relationship for the purpose of applying Model Rule 1.7 to the OAG. The representation of the Office of the Governor is not "directly adverse" to the prosecutorial power, nor is there "a significant risk that the representation [of the Commonwealth in a criminal case] will be materially limited by the [OAG's] responsibilities" to the Office of the Governor. MRPC R. 1.7(a). Where one OAG attorney's representation of a client could create a concurrent conflict, screening may allow the representation to continue without an inherent ethical violation. *See supra* at ¶ 51.

¶ 64     The court erred in finding that Model Rule 1.7 must be applied to the parties as if Torres is a current client. The OAG is not required to receive written, informed consent from Torres before continuing his prosecution, as required by MPRC R. 1.7(b) if he were a client, nor is the OAG required by this rule to "wall off the conflicted portions of the OAG" because two clients are in adverse positions. Appendix at 26.

¶ 65     Attorneys, including the OAG, have ethical requirements beyond those codified in the Model Rules. We hold that an attorney in the OAG who has been exposed to privileged information which requires the use of screening procedures must still provide notice of the screening procedure to the individual or

organization whose privileged information has been exposed, as if in compliance with Model Rule 1.10. Such written notice should be "promptly given to [the individual] to enable [them] to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures." MRPC R. 1.10(a)(2)(ii).

¶ 66     Even though Torres individually is not, and never has been, a client of the OAG, the relationship between the two parties is like that of an attorney and client. Government employees in their official capacities who receive advice from government attorneys may later face criminal prosecution in their personal capacity. *See Jasper v. Quituqua*, 1999 MP 04; *see also* Appendix at 39 (noting that the OAG provided the Office of the Governor legal advice on responding to a legislative subpoena of which Torres was later held in contempt for defying). The relationship between the OAG and other government officials in this situation would be of such consequence as to rise to the level of necessitating the sort of protection available to a former client.

¶ 67     This requirement is analogous to the written notice requirement owed to a former client under Model Rule 1.10 because the purpose of the notice is the same for former clients and individuals such as Torres. The certification provided in writing by an attorney complies with Model Rule 1.10's requirement and gives "the former client assurance that the client's material confidential information has not been disclosed or used inappropriately, either prior to timely implementation of a screen or thereafter." MRPC R. 1.10 cmt. 10. "The notice is intended to enable the former client to evaluate and comment upon the effectiveness of the screening procedures." MRPC R. 1.10 cmt. 9.

¶ 68     The OAG must provide written notice of compliance with adequate screening procedures when prosecuting a current or former government official for whom an attorney with the OAG has been exposed to privileged information while representing the Commonwealth or a client agency. Though Model Rule 1.10 is not mechanically applicable to the OAG, *supra* at ¶ 49, it still can provide a vehicle for disclosing the necessary screening procedures.

### E. Evidentiary hearing on disqualification

¶ 69     Finally, we consider whether the trial court erred by failing to hold an evidentiary hearing before disqualifying the OAG in July 2024. Opening Br. at 28. As part of the larger review of the disqualification of the OAG, we review this issue on the abuse of discretion standard. *Williams*, 68 F.4th at 571.

¶ 70     *In re San Nicolas* allows for the disqualification of the entire OAG office "under narrow circumstances" when the OAG has had notice and a hearing. 2013 MP 8 ¶¶ 20–21. A conflict of interest cannot be imputed to an entire office without direct evidence of officewide involvement. *Williams*, 68 F.4th at 574.

¶ 71    Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). Here, notice was provided to the Commonwealth in May 2022. Appendix at 2. A complete evidentiary hearing was also held that month, including testimony about the OAG screening procedures and Glass's exposure to privileged information. *Id.* at 242. This is sufficient to satisfy due process under *San Nicolas.* [2]

### V. CONCLUSION

¶ 72    In summary, we hold the Office of the Attorney General cannot be summarily disqualified through the imputation of a conflict to the entire Office without sufficient justification. The trial court did not err in disqualifying the named, individual attorneys, but should not have imputed such conflicts to the Office as a whole. We REVERSE in part and AFFIRM in part.

SO ORDERED this 22nd day of August, 2025.


/s/
JOHN A. MANGLOÑA
Associate Justice


/s/
ROBERT J. TORRES, JR.
Justice Pro Tempore


/s/
SABRINA S. MCKENNA
Justice Pro Tempore


COUNSEL

J. Robert Glass, Jr., Chief Solicitor, Saipan, MP, for Plaintiff-Appellant.

---

[2]    It is the best practice for the OAG to memorialize its case screening procedures in writing, even if notice to another party or the court is not required, so that there is no need to rely on an evidentiary hearing to explain what procedure, if any, was applied to the case. *Cf.* Appendix at 242 (testimony from Attorney General Manibusan that this case may not have had written notice as required by the OAG's policies and procedures manual).

Anthony H. Aguon, Joaquin DLG. Torres, Victorino DLG. Torres, and Viola Alepuyo, Saipan, MP, for Defendant-Appellee.

NOTICE

This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e-mail Supreme.Court@NMIJudiciary.gov.